UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MTD PRODUCTS INC., | ) | |
| | ) | CASE NO.  1:21-cv-1962 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE BRIDGET M. BRENNAN |
| | ) | |
| AMERICAN HONDA MOTOR CO., | ) | |
| INC., | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

Before this Court is Defendant American Honda Motor Co., Inc.'s ("Honda") motion to dismiss Plaintiff MTD Products Inc.'s ("MTD") complaint for failure to state a claim.  (Doc. No. 29.)  MTD opposed this motion (Doc. No. 31), and Honda filed a reply brief in support of dismissal (Doc. No. 33).  For the reasons that follow, the Court GRANTS in part and DENIES in part Honda's motion to dismiss.

## I.   BACKGROUND

### A.   Factual Allegations

#### 1.  The Parties

MTD manufactures and sells outdoor power equipment and related accessories throughout the world.  (Doc. No. 30 at PageID 355, ¶ 6.)  It is one of the market leaders in the manufacture of walk-behind lawnmowers.  (*Id.*)

Honda is an American subsidiary of a Japanese car, motorcycle, and engine manufacturer.  (*Id*. at PageID 354, ¶ 3.)  Honda manufactures gasoline engines designed for

walk-behind lawnmowers and sells them to MTD and other lawnmower manufacturers.  (*Id.* at PageID 355, ¶ 7.)  Honda also makes and sells walk-behind lawnmowers.  (*Id.*)  This makes Honda both a supplier and a competitor of MTD.  (*Id.*)

### 2.  Overview of MTD's Relationship with Honda

MTD and Honda's business relationship lasted for over 14 years.  (*Id.* at PageID 355, ¶ 8.)

The business relationship operated on a "program year" cycle.  (*Id.* at PageID 355, ¶ 9.)  Throughout summer and early fall, MTD negotiated the terms of an annual agreement.  (*Id.*)  The agreement functioned as the parties' general understanding of how many engines Honda would sell to MTD from late fall of that year to early summer of the following year.  (*Id.*)  Honda would ship engines throughout the program year after MTD executed a "release," an electronic purchase order.  (*Id.* at PageID 360, ¶ 31.)  Throughout the program year, Honda informed MTD of its current inventory, and MTD forecasted to Honda the quantity and types of engines it needed.  (*Id.* at PageID 360-61, ¶¶ 32-33.)  MTD primarily purchased the 160 GC/GCV ("160") and 190 GC/GCV ("190") engines from Honda.  (*Id.* at PageID 355, ¶ 8.)

MTD negotiated with retailers such as Lowe's, Home Depot, and Walmart for the sale of MTD lawnmowers as it negotiated with Honda on the terms of the annual agreement.  (*Id.* at PageID 356, ¶ 10.)  MTD typically solidified its commitments with retailers by early fall, produced the lawnmowers throughout fall and early winter, and shipped them to retailers throughout winter and spring.  (*Id.* at PageID 356, ¶¶ 10-11.)  Thus, MTD's demand for Honda's engines was greatest in the fall.  (*Id.* at PageID 356, ¶ 11.)  But MTD continued to purchase engines and build lawnmowers throughout the entire program year to meet retailers' demands.  (*Id.*)

2

The timeline of a program year necessitated that Honda fulfill MTD's releases. (*Id.* at PageID 356-57, ¶¶ 11, 13.)  If Honda did not meet MTD's demand during the fall, MTD could not fulfill its obligations to retailers in the spring. (*Id*. at PageID 357, ¶ 13.)  Honda was aware of its impact on MTD's business, as it insisted upon reviewing MTD's agreements with retailers. (*Id.*)  Honda's engines were also non-fungible, meaning MTD could not fulfill its commitments to the retailers by simply purchasing a different type of engine from another company. (*Id.* at PageID 356, ¶ 12.)  MTD was also required to undergo extensive design, testing, and regulatory approval if it modified its lawnmowers. (*Id.* at PageID 356-57, ¶ 12.)

Aside from profits generated from MTD's purchases, Honda also benefited from its relationship with MTD through cross-promotion. (*Id.* at PageID 358, ¶ 17.)  MTD previously agreed to sell its lawnmowers made with Honda's engines with a "Powered by Honda" label. (*Id.*)  Consequently, MTD gave Honda additional visibility to customers, which in turn helped promote the Honda-manufactured lawnmowers. (*Id.* at PageID 358, ¶¶ 17-18.)

### 3. The 2020-2021 Program Year

#### a. *Negotiations*

Like past years, Honda and MTD negotiated a general agreement for the 2020-2021 program year throughout the summer and the fall of 2020. (*Id.* at PageID 357-58, ¶¶ 15, 20.)  COVID-19-related staffing and supply chain issues complicated these negotiations. (*Id.* at PageID 357-58, ¶15.)  As MTD negotiated with Honda, MTD also negotiated with retailers. (*Id.* at PageID 258, ¶ 16.)  Honda was involved in some of MTD's negotiations with retailers. (*Id.*)  For example, Honda directly contacted Lowe's to assuage Lowe's' concern that MTD could not provide the "Powered by Honda" labeled lawnmowers. (*Id.* at PageID 358, n.2.)

During negotiation of the general agreement, Honda continued to sell engines to MTD. (*Id.* at PageID 360, ¶ 27.)  Around this time, Honda informed MTD that it would eventually phase down production of the 160 and the 190 engines.  (*Id.* at PageID 360, ¶ 29.)  The parties recognized that MTD would likely purchase different Honda engines in the "2022 product year or later."  (*Id.*)  Honda, however, never stated that it would stop selling MTD the 160 and the 190 engines during the 2020-2021 program year.  (*Id.*)

### b.  *Agreement*

On November 3, 2020, MTD and Honda reached their general agreement for the 2020-2021 program year.  (*Id.* at PageID 359, ¶ 21.)  The agreement came in the form of an email (the "November Email") from Patrick Gray, Honda's lead salesperson for the MTD account.  (Doc. No. 30 at PageID 359, ¶ 21; November Email, Doc. No. 30-1[1] at PageID 370.)  The November Email states Honda's monthly commitment schedule with MTD through the end of 2021.  (Doc. No. 30 at PageID 359, ¶ 21; Doc. No. 30-1 at PageID 370.)  Attached to the November Email is a spreadsheet indicating that Honda would deliver a certain number of engines every month through September 2021, with another specified number of units allocated for delivery each month through December 2021.  (Doc. No. 30 at PageID 359, ¶ 21; Doc. No. 30-1 at PageID 371.)  The end of the November Email informs that MTD should confirm with Honda how it would like the "color split" because Honda would "do [its] best to accommodate MTD's requests within the given production volumes."  (Doc. No. 30-1 at PageID 370.)

---

[1] The Court considers the emails attached to the complaint because they are (a) attached to either the complaint or a motion to dismiss, (b) referred to in the complaint, and (c) central to the plaintiff's claims.  *Bassett v. National Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

About a month after Mr. Gray sent the November Email, at Honda's request, the parties executed a document ("The Program") drafted by Honda titled "2021 Season: Lawn and Garden Program." (Doc. No. 30 at PageID 359, ¶ 22; The Program,[2] Doc. No. 30-2.)  The Program states that its objective is to maximize the market presence of the "Powered by Honda" labeled lawnmowers produced by Original Equipment Manufacturers ("OEMs").  (Doc. No. 30-2 at PageID 372.)  To do so, The Program memorializes the prices that Honda will charge OEMs – such as MTD – for engines broken down by each engine's SKU and model number.  (Doc. No. 30 at PageID 359, ¶ 22; Doc. No. 30-2 at PageID 372-73.)  The Program explains that OEMs are guaranteed these rates if they meet minimum purchase requirements.  (Doc. No. 30-2 at PageID 373.)  The Program is not an integrated contract.  (Doc. No. 30 at PageID 359, ¶ 26.)

Also attached to The Program is the "2021 Season: Lawn and Garden Program SKU Addendum."  (Doc. No. 30-2 at PageID 367-77.)  It lists the "retail price point" and "estimated annual volume" for six engines with different model numbers.  (*Id.*)  An MTD and a Honda employee signed the addendum.  (*Id.*)

### c. *Parties' Relationship Immediately Prior to Honda's Cut-Off*

Based on the November Email and The Program, MTD undertook its production, sales, and business planning.  (*Id.* at PageID 360, ¶ 30.)  Honda knew that MTD was relying on these documents.  (*Id.*)  The parties also regularly discussed their short- and medium-term strategic issues.  (*Id.* at PageID 362, ¶ 39.)  Despite challenges, MTD had a successful program year – including a successful sales season in the spring of 2021.  (*Id.* at PageID 361, ¶ 35.)

---

[2] MTD also attached The Program to its complaint.  (Doc. No. 30-2.)  The Court considers this document because it is (a) attached to the complaint, (b) referred to in the complaint, and (c) central to MTD's claims.  *Bassett*, 528 F.3d at 430.

By mid-May 2021, Honda circulated documents regarding the next program year, which was set to begin in October 2021.  (*Id.* at PageID 362, ¶ 39.)  Honda demanded that MTD disclose anticipated purchase volumes and retailer identities by June 1, 2021.  (*Id.*)  This demand came much earlier than it did in 2020.  (*Id.*)  MTD provided the information.  (*Id.*)  It was prepared to make similar purchase commitments to Honda to what it made in the previous program year.  (*Id.*)

### 4.  Honda Cuts Off Sales to MTD on June 29, 2021

On June 29, 2021, Honda sent MTD a letter called "Statement by Honda Power Equipment Regarding GC and GS Series Engine Production" (the "Termination Letter").  (Doc. No. 30 at PageID 361, ¶ 36; Termination Letter,[3] Doc. No. 30-3 at PageID 378.)  The letter states that Honda discontinued the production of the 160 and the 190 engines after a "thorough analysis of [its] operational efficiencies and a commitment to move the business toward newer models." (Doc. No. 30-3 at PageID 378.)  The letter then informs that, effective immediately, Honda "would no longer accept new purchase orders" for the 160 and the 190 engines.  (*Id.*)  Finally, it also indicates that Honda would continue production on its newer engine models, but the distribution of these engines would be "focused primarily on pressure washer applications and no longer offered for lawnmower applications."  (*Id.*)  Honda did not warn MTD of this decision before sending the letter.  (Doc. No. 30 at PageID 361, ¶ 36.)

The Termination Letter was the result of months of internal planning within Honda.  (*Id.* at PageID 362-63, ¶ 41.)  Honda was aware of its intention to terminate while MTD continued to

---

[3] The last document MTD attaches to its complaint is Honda's letter terminating its relationship with MTD.  (Doc. No. 30-3.)  The Court reviews this document because it is (a) attached to the complaint, (b) referred to in the complaint, and (c) central to MTD's claims.  *Bassett*, 528 F.3d at 430.

negotiate with retailers, assuming Honda would continue to ship its engines throughout 2021. (*Id.*)

### 5.  Impact on MTD

MTD was blindsided by the Termination Letter.  (*Id.* at PageID 362, ¶ 40.)  MTD attempted to negotiate with Honda after receiving the Termination Letter.  (*Id.* at PageID 363, ¶ 42.)  In the end, Honda forced MTD to accept a reduced number of the 160 and the 190 engines, as Honda threatened to send zero engines to MTD if MTD did not amend its releases requesting the entirety of the engines it was owed in the November Email.  (*Id.* at PageID 363, ¶¶ 42, 43.)  Honda's last shipment to MTD occurred on or about October 1, 2021.  (*Id.* at PageID 363, ¶ 44.)  MTD received significantly fewer engines than it anticipated from Honda in the latter half of the 2020-2021 program year.  (*Id.*)  It did not receive any of the engines that Honda committed through the end of 2021.  (*Id.*)

Honda adversely impacted MTD's business.  (*Id.* at PageID 364, ¶ 46.)  MTD was forced to expend resources to mitigate the Termination Letter's fallout.  (*Id.*)  Honda also damaged MTD's relationship with its customers and its workforce.  (*Id.* at PageID 364, ¶ 47.)

### B.  <u>Procedural Background</u>

MTD initiated this action on October 15, 2021.  (Doc. No. 1.)  The complaint alleges four causes of action: breach of contract (Count I), breach of the duty of good faith and fair dealing (Count II), promissory estoppel (Count III), and tortious interference with business relationships (Count IV).  (*Id.*)  On December 10, 2021, Honda answered the complaint and filed a motion to dismiss.  (Doc. Nos. 9 & 10.)  MTD opposed this motion (Doc. No. 12), and Honda filed a reply brief in support of the motion (Doc. No. 15).

Due to the complaint and the motion to dismiss briefing being heavily redacted, the Court ordered that the parties refile the documents under seal. (Doc. No. 13.) In another order, the Court instructed the parties to refile the original redacted documents with redactions consistent with Sixth Circuit caselaw. (Doc. No. 27.) Pursuant to these orders, the docket contains a publicly available, lightly redacted complaint (Doc. No. 30), motion to dismiss (Doc. No. 29), opposition to the motion to dismiss (Doc. No. 31), and a reply in support of the motion to dismiss (Doc. No. 33). The docket also contains a sealed complaint (Doc. No. 17), motion to dismiss (Doc. No. 20), opposition to the motion to dismiss (Doc. No. 18), and a reply brief in support of the motion to dismiss (Doc. No. 16).

The Court's citations reflect the lightly redacted versions of these documents.

## II. <u>ANALYSIS</u>

### A. <u>Standard of Review</u>

When addressing a motion to dismiss brought under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must construe the complaint in the light most favorable to the plaintiff and accept all well-pleaded material allegations in the complaint as true. *United States ex rel. Ibanez v. Bristol-Myers Squibb Co.*, 874 F.3d 905, 914 (6th Cir. 2017) (setting forth the standard of review for a motion to dismiss); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The sufficiency of the complaint is tested against the notice pleading requirement that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). Although this standard is a liberal one, a complaint must still provide the defendant with "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Thus, "[t]o survive a motion

to dismiss, a complaint must contain sufficient factual matter, accepted as true," to state a

plausible claim. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

Facial plausibility means that the complaint contains "factual content that allows the

Court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Id.* (citing *Twombly*, 550 U.S. at 556).  Such plausibility "is not akin to a 'probability

requirement,' but it asks for more than a sheer possibility that a defendant has acted

unlawfully." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the

mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the

pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).  In such a case, the

plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [and the]

complaint must be dismissed." *Twombly*, 550 U.S. at 570; *see Iqbal*, 566 U.S. at 678.

A complaint need not set down in detail all the particulars of a plaintiff's

claim.  However, "Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with

nothing more than conclusions." *Iqbal*, 566 U.S. at 678 (This standard requires "more than an

unadorned, the-defendant-unlawfully-harmed-me accusation.").  "Bare assertions," basic

recitations of the elements of the cause of action, or "conclusory" allegations are not entitled to

the assumption of truth and, without more, do not satisfy the Rule 8 notice standard. *Id.*

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).

### B.  <u>Breach of Contract Claim</u>

Honda first moves to dismiss MTD's breach of contract of claim.  MTD premises its

breach of contract claim on Honda breaching its commitment to sell MTD engines throughout

2021.  (Doc. No. 30 at PageID 364, ¶ 49.)

Honda argues that dismissal is appropriate because MTD has failed to plead that Honda breached any legal obligation to ship MTD engines.  To support dismissal, Honda first invokes the rule of completeness and argues that this Court must review the emails attached to its motion that were sent in the same thread as the November Email.  (Doc. No. 29-1 at PageID 327.)  Next, Honda asserts that these emails prove that the quantities discussed in the November Email are mere estimates.  (*Id.* at PageID 331.)  Building on this and citing cases analyzing the statute of frauds, Honda argues that MTD did not plead the existence of a writing with a quantity term – a requirement to enforce a sale of goods contract.  (*Id.*)  Finally, Honda argues that the breach of contract claim should be dismissed because MTD's allegations are too vague to provide it with proper notice of the breach of contract claim.  (*Id.* at PageID 336.)

MTD contests all of Honda's arguments.  It argues that the rule of completeness does not apply to this situation and that the November Email satisfies the statute of frauds.  (Doc. No. 31 at PageID 389-97.)  Last, MTD asserts that its breach of contract claim is not vague: it alleged that Honda breached its contractual obligations to ship engines through the end of 2021.  (*Id.* at PageID 397.)

The Court addresses each argument and finds that MTD has alleged a plausible breach of contract claim.

### 1.  Additional Emails

The Court begins its analysis with the additional emails that Honda attaches to its complaint.  Honda's briefing on these emails has two components.  Honda first argues that this Court must consider these emails under caselaw applying the rule of completeness, codified in Fed. R. Evid. 106, in the motion to dismiss context.  (Doc. No. 29-1 at PageID 327 n. 2 (citing *Magellan Int'l Corp. v. Salzgitter Handel GmbH*, 76 F. Supp. 2d 919 (N.D. Ill. 1999) & *Lowman*

*v. Platinum Prop. Mgmt. Servs., Inc.*, 166 F. Supp. 3d 1356 (N.D. Ga. 2016)); Doc. No. 33 at

PageID 430 (citing *Worcester v. Stark State Coll.*, No. 5:18-CV-1704, 2019 WL 3006429 (N.D.

Ohio July 10, 2019)).) Honda then cites to Sixth Circuit caselaw that it asserts compels this

Court to take as true what is stated in these emails over what MTD alleged in its complaint.

(Doc. No. 29-1 at PageID 329, 337 (citing *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430 (6th

Cir. 2012)).) Ultimately, the Court finds that it may consider the additional emails attached to

MTD's motion to dismiss, but it cannot disregard MTD's allegations in favor of Honda's

interpretation of these emails.

 The authority cited in Honda's briefs does not support admitting these emails under the

evidentiary rule of completeness. Notably, two of the cases that Honda cites did not apply the

rule of completeness and instead reviewed the exhibits attached to the motion to dismiss because

the courts found that they were "central" to the plaintiff's claims. *Worcester*, 2019 WL 3006429,

at *2, n.1 ("Here, the motion to dismiss has four exhibits, all of which are 'central to the claims'

in the complaint. The Court has considered each exhibit in reaching this decision."); *Lowman*,

166 F. Supp. 3d at 1358 (reviewing emails attached to a motion to dismiss that were sent on the

same chain as the emails the plaintiff attached to its complaint because the emails were "central

to the plaintiff's claim and undisputed."). The one case Honda cites that analyzed the rule of

completeness also reviewed the exhibits attached to the defendant's motion to dismiss because it

determined they were central to the plaintiff's claims. *Magellan*, 76 F. Supp. 2d at 922-23. The

court only cited the rule of completeness to help support this finding. *Id.* at 923. In other words,

the rule of completeness was an aid that helped guide the court's reasoning, not the doctrine

under which the exhibits were admitted. *See id.*

Nevertheless, the Court may review the emails attached to Honda's motion under the Sixth Circuit's test for determining whether to consider exhibits attached to a motion to dismiss. *See Bassett*, 528 F.3d at 430.  A court can consider documents attached to either the plaintiff's complaint or the defendant's motion to dismiss if they are referred to in the complaint and central to the plaintiff's claims.  *Id.*  Here, all elements are met.  MTD refers to these emails in its complaint by discussing MTD and Honda's communications throughout the fall of 2020.  (Doc. No. 30 at PageID 357-58, ¶¶ 15, 20.)  Further, these specific emails are "central" to MTD's claims because they relate directly to the November Email.  (*Id.* at PageID 359, ¶ 21.)  *See Magellan*, 76 F. Supp. 2d at 922-23; *Worcester*, 2019 WL 3006429, at *2, n.1.

Although the Court agrees with Honda that it may review these exhibits, the Court cannot analyze these emails without recognizing the constraints of the motion to dismiss standard.  After asking the Court to consider the emails, Honda implies that these emails must be considered without regard to the allegations in MTD's complaint.  This argument is contrary to law for two reasons.

First, Honda ignores that everything in a motion to dismiss must be reviewed in the light most favorable to the plaintiff – even documents attached to the complaint or a motion to dismiss.  *E.g., Nolan v. Detroit Edison Co.*, 991 F.3d 697, 707-08 (6th Cir. 2021); *Jones v. City of Cincinnati*, 521 F.3d 555, 561 (6th Cir. 2008).  Notably, one of the cases that Honda cited in support of the consideration of these emails recognized this constraint.  *Magellan*, 76 F. Supp. 2d at 923 ("[T]his Court is duty-bound at this stage of the game to look at the picture of the parties' transaction (as framed by their correspondence) through a lens most favorable to [the plaintiff] . . ..").  Accordingly, Honda incorrectly assumes that this Court can review these emails without considering what MTD alleged in its complaint.

Second, Honda posits that an exhibit always controls if it is inconsistent with an allegation. Honda's reliance on *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430 (6th Cir. 2012) to support this argument is misplaced. In *Carrier*, the plaintiff attached decisions by the European Commission ("EC") – in which the judicial bodies found that the defendant violated foreign antitrust laws – to help it allege that the defendant violated domestic antitrust laws. 673 F.3d at 436-37. The defendant sought to dismiss the complaint by arguing that the EC decisions contradicted some of the plaintiff's allegations. *Id.* at 441. The court noted that the "general rule" provided that the EC decisions controlled if they were inconsistent with the plaintiff's complaint. *Id.* at 442. But the court then explained that this general rule was "not always appropriate" and made "less sense when . . . the exhibit [was] not a legally dispositive document" such as a contract. *Id.* (internal quotation marks omitted). The court then stated that it would not "impermissibly [] question the evidentiary foundation" of the plaintiff's complaint by taking as true everything in the EC decisions while disregarding the plaintiff's allegations. *Id.* Here too, the emails are not "legally dispositive document[s]," but rather communications sent after the allegedly legally dispositive November Email. *See id.* Therefore, it does not necessarily follow that this Court must question "the evidentiary foundation" of MTD's complaint by disregarding MTD's allegations while giving statements made in the emails the presumption of truth. *See id.*

The upshot is that the Court can review the emails attached to Honda's motion. But the downside for Honda is that it can only do so in the light most favorable to MTD. It also cannot simply disregard an allegation in the complaint.

MTD's relevant factual allegations are as follows: At the beginning of every program year, the parties came to a general understanding of how many engines Honda would sell to

MTD and how many engines MTD would buy from Honda.  (Doc. No. 30 at PageID 355, ¶¶ 8-9.)  But throughout the program year, Honda would only ship engines to MTD if the parties executed a release.  (*Id.* at PageID 360-61, ¶¶ 31, 32.)  These releases also formalized the specific types of engines MTD would be receiving.  (*Id.*)  For the 2020-2021 program year, after a prolonged negotiation process caused by COVID-19-related difficulties, MTD and Honda came to their yearly understanding through the November Email.  (*Id.* at PageID 359, ¶ 21.)

With these allegations in mind, the Court finds that these emails are not inconsistent with MTD's complaint.

Honda argues that the emails contradict MTD's allegation that the November Email represented the parties' buy/sell commitments for the program year.  (Doc. No. 29-1 at PageID 326-327.)  To support this, Honda highlights that, throughout the November Email thread, the parties both expressed their understanding that Honda could not provide completely accurate information regarding its inventory.  (*Id.*)  For example, in one email, Mr. Gray stated, "all numbers provided are only as of today" and "are not secured for MTD until there's a PO in our system."  (Doc. No. 29-2 at PageID 350.)  In another email, Mr. Gray wrote:

> I think all involved know what you send in won't be 100% accurate so I'd just ask that when MTD finalizes SKU strategy and placement we work together and re-visit the topic to understand any large changes.  I think that will be necessary to understand color split so we can also reconcile submitted program volumes at this point.

(*Id.* at PageID 348.)

To Honda, these communications show that the November Email was merely Honda providing MTD with estimates of its inventory through the end of 2021, as opposed to obligating itself to sell MTD those engines.  (Doc. No. 33 at PageID 426-28.)  But Honda interprets these emails without considering MTD's allegation that the November Email – as reflected in the

14

attachment – was the parties' buy/sell commitments for the total number of engines; meaning it did not finalize the engines' delivery dates, model numbers, or colors.[4] (Doc. No. 30 at PageID 359, ¶ 21.) According to the complaint, these details were all sorted out through releases. (*Id.* at PageID 360-61, ¶¶ 31, 32.) Put another way: the November Email only formalized how many engines Honda must sell to MTD through the end of 2021. (*Id.* at PageID 359, ¶ 21.) The Court must accept this version of events. At this stage of the proceeding, the Court finds that it was entirely natural that, after the November Email, MTD and Honda would communicate their understanding that Honda could only provide estimates relating to the availability of different engine models and colors.

In the end, the additional emails do not change the Court's analysis. In deciding whether dismissal is appropriate, the Court still takes as true that the November Email was the parties' general buy/sell obligations through the end of 2021. And, consistent with the parties' prior dealings, the parties would determine the specific models and colors of engines that would be bought and sold throughout the program year with releases. The Court must decide whether these allegations are enough to plausibly allege that Honda and MTD formed a binding contract.

## 2. Quantity Term

When the contract at issue is for the sale of goods over five hundred dollars, like here, Ohio's statute of frauds requires the plaintiff to allege that the parties executed a writing memorializing the agreement. Ohio Rev. Code § 1302.04; *see also NZR Retail of Toledo, Inc. v.*

---

[4] The Court notes that if MTD truly wanted to hide the fact that the parties never finalized the color breakdown of the engines MTD would buy from Honda, it would not have provided the November Email in its entirety. At the bottom of the November Email, Mr. Gray stated, "Once you have a chance to review how you'd like the color split please let me know and we will do our best to accommodate MTD's requests within the given production volumes." (Doc. No. 30-1 at PageID 370.)

*Beck Suppliers, Inc.*, 2016-Ohio-3205, 2016 WL 3032767, at *3-4 (Ohio Ct. App. May 27, 2016)

(discussing the statute of frauds in the motion to dismiss context).  But the writing requirement is

not exhaustive.  The statute's official comment section explains:

> The required writing **need not contain all the material terms** of the contract and
> such material terms as are stated need not be precisely stated.  **All that is required
> is that the writing afford a basis for believing that the offered oral evidence
> rests on a real transaction.**  It may be written in lead pencil on a scratch pad.  It
> need not indicate which party is the buyer and which the seller.  **The only term
> which must appear is the quantity term which need not be accurately stated**
> but recovery is limited to the amount stated.  The price, time and place of payment
> or delivery, the general quality of the goods, or any particular warranties may all
> be omitted.

Official Comment One to Ohio Rev. Code § 1302.04 (emphasis added).  Accordingly, a writing

satisfies the statute of frauds if it contains some sort of quantity term.  *See id.*

Not surprisingly, MTD maintains that the November Email satisfies the statute of frauds.

In turn, Honda posits that the November Email is insufficient because it lacks a quantity term.

To support this, Honda points out that The Program's addendum has different quantity terms

than those listed in the November Email, which shows that the November Email's quantities

were mere preliminary estimates.  (Doc. No. 33 at PageID 431-32.)  Honda also cites three cases

allegedly providing that only the parties' releases could satisfy the statute of frauds.  (Doc. No.

29-1 at PageID 331-33.)  Honda's arguments are not well-taken.

Regarding The Program's impact on how this Court should review the November Email,

Honda again ignores that this Court must review exhibits in the light most favorable to MTD.

*E.g., Nolan,* 991 F.3d at 707-08.  Specifically, Honda states that "The Program shows that MTD

contemplated a completely different quantity of [e]ngines than [the November Email], and thus

there was no meeting of minds through the November Emails."  (Doc. No. 33 at PageID 431-32.)

But in its opposition brief, MTD asserts that The Program is merely a "form document drafted by

16

Honda and not unique to the Honda/MTD relationship," and therefore, The Program does not impact the parties' commitments in the November Email. (Doc. No. 31 at PageID 393.) The Court finds that MTD's explanation of The Program is reasonable and consistent with the complaint's allegations. Consequently, the Court reviews The Program in this light and finds that the quantities listed within do not impact whether the November Email satisfies the statute of frauds. *See Nolan,* 991 F.3d at 707-08 ("If . . . the document provides support for both parties' version of events, we view the facts in the light most favorable to the plaintiff.")

Moving to the cases that Honda asserts warrant dismissal. The first case is *Revere Plastic Sys., LLC v. Plastic Plate, LLC*, 509 F. Supp. 3d 986 (N.D. Ohio 2020). In this case, the court examined whether there was a binding agreement for the sale of goods between a purchaser and supplier of Whirlpool product parts. *Revere*, 509 F. Supp. 3d at 990. The writings the plaintiff argued created an obligation were blanket purchase orders, containing the pricing terms but no duration or quantity terms. *Id.* at 997. According to these blanket purchase orders, the defendant would not ship any goods until the plaintiff submitted a release. *Id.* at 999. Nevertheless, the plaintiff argued that the defendant breached these blanket purchase orders by demanding cash advances and refusing to ship goods absent a price increase. *Id.* at 996. The court granted the defendant summary judgment because it found that these blanket purchase orders contained no quantity term and thus did not satisfy the statute of frauds. *Id.* at 999-1002. Further, the blanket purchase orders did not qualify for any exception to the quantity term requirement because the facts did not indicate the purchase orders were requirements contracts or firm offer agreements. *Id.* at 998.

MTD's breach of contract claim is distinct from the plaintiff's claim in *Revere*. Again, MTD's breach of contract claim is premised on the parties agreeing to an overall commitment

17

for the purchase of a set number of engines until the end of 2021, with the timing and specifications (*e.g.,* color) of the engines that Honda would send to MTD under this agreement to be finalized throughout the year.  These allegations are different from the record evidence in *Revere* that allowed the court to conclusively determine the blanket purchase orders at issue had no definite quantity term because all numbers on these writings were forecasts.  *See id.* at 1000.  Again, the Court must take MTD's allegations as true, and, considering these allegations, the Court does not find that the numbers in the November Email are, as a matter of law, just forecasts.

There are similar problems with applying the other cases that Honda argues dictate that the Court dismiss MTD's breach of contract claim.  In *Advanced Plastics Corp. v. White Consol. Indus., Inc.*, 47 F.3d 1167 (6th Cir. 1995), the court determined that a supplier and a purchaser of refrigerator parts, outside of specific releases, formed no binding agreement for the sale of goods because all other writings exchanged between the parties before a release did not include quantity terms.  47 F.3d 1167, at *1.  The defendants also put a disclaimer making it explicit that any quantities listed in non-purchase order documents were estimates and did not constitute binding commitments.  *Id.* at *2.  Similarly, in *Harris Thomas Indus., Inc. v. ZF Lemforder Corp.*, No. 3:06CV190, 2007 WL 3071676 (S.D. Ohio Oct. 19, 2007), the court found that a blanket purchase order did not constitute a binding agreement between the parties because it did not contain a quantity term or have language indicating that the parties intended to create a requirements contract.  2007 WL 3071676, at *5 ("[W]here there is a blanket purchase order in effect, but material releases are issued which govern supply and delivery, the only contracts are the releases that have been accepted between the parties.").

To reiterate, MTD does not claim that the quantities Mr. Gray provided in the November Email were mere estimates, and it attached a detailed spreadsheet in support.  The Court therefore cannot hold that these cases dictate that this Court dismiss MTD's claim.  *Advanced Plastics* and *Harris*, like *Revere*, were decided at the summary judgment stage, which allowed the court to examine the record evidence and determine that a reasonable jury could only find that the writings at issue were simply blanket purchase orders.  The Court does not make the same finding with only the pleadings and the exhibits attached to the complaint and the motion to dismiss.

Honda has failed to identify – nor has this Court located any – authority standing for the proposition that the November Email, if it is what MTD alleges it is, could not plausibly constitute a binding agreement.

### 3.  Vagueness

In its final attempt to dismiss the breach of contract claim, Honda agues that MTD's claim is too vague and should be summarily dismissed.  (Doc. No. 29-1 at PageID 336.) Specifically, Honda asserts that the complaint fails to give proper notice of what contractual term Honda breached.  (*Id.* (citing *Northampton Rest. Grp. Inc. v. FirstMerit Bank, N.A.*, 492 F. App'x 518 (6th Cir. 2012)).)  MTD responds that its complaint is not vague: it identified that (a) Honda had a contractual duty to ship engines throughout 2021, (b) Honda breached this obligation, and (c) it was harmed because of said breach.  (Doc. No. 31 at PageID 397-98.)

Under Ohio law, to prevail on a breach of contract claim, the plaintiff must prove that (1) a contract existed, (2) the plaintiff performed under the contract, (3) the defendant breached the contract, and (4) the plaintiff suffered damages.  *Dean v. Chamberlain Univ., LLC*, No. 1:20-CV-02433, 2021 WL 3617471, at *2 (N.D. Ohio Aug. 16, 2021).

In *Northampton Rest. Grp. Inc. v. FirstMerit Bank, N.A.*, 492 F. App'x 518 (6th Cir. 2012), the Sixth Circuit clarified what the plaintiff must allege to plead a plausible breach of contract claim.  In this case, the court found the plaintiff failed to state a breach of contract claim because the plaintiff merely alleged that it had written agreements with the defendant, which contained terms that the defendant breached.  *Northampton*, 492 F. App'x at 522.  But, instead of attaching the contracts to the complaint, the plaintiff asserted that it "no longer possessed copies of the [the contracts]" and asked that "it [] be allowed to conduct discovery in order to obtain the contracts that would show [the defendant's] actions violated their agreement."  *Id.*  The court held that this was not enough to survive a motion to dismiss because the plaintiff did not fulfill the "basic tenet of contract law" of identifying the written contract and term within it that was allegedly breached.  *Id.* (internal quotation marks omitted).

MTD's complaint does not have the same shortcomings as the *Northampton* plaintiff's. MTD stated that the parties formed a contract with the November Email.  (Doc. No. 30 at PageID 359, ¶ 21.)  It also alleged that Honda breached the quantity terms in the November Email through the Terminal Letter.  (*Id.* at PageID 361, ¶ 36.)  Finally, MTD attached both the November Email and the Termination Letter to the complaint.  (Doc. Nos. 30-1 & 30-3.) Accordingly, MTD satisfied the requirements of *Northampton* and pled a plausible breach of contract claim.

Having reviewed all arguments advanced in support of dismissal, the Court DENIES Honda's motion as it relates to MTD's breach of contract claim.

### C.  <u>Good Faith and Fair Dealing Claim</u>

Next, Honda moves to dismiss MTD's breach of the covenant of good faith and fair dealing claim.  For this claim, MTD states that Honda knowingly induced it to rely on the

production commitments outlined in the November Email and then abruptly refused to process

orders midway through the program year.  (Doc. No. 30 at PageID 365-66, ¶ 57.)  Honda argues

that MTD has failed to plead the elements of a good faith and fair dealing claim and therefore

seeks to dismiss the claim.  (Doc. No. 29-1 at PageID 338-39.)  In making this argument, Honda

points out that a term in The Program – stating that Honda may stop sending engines to MTD

immediately after providing MTD with a written notice – undermines the notion that it acted in

bad faith.  (*Id.*)

To establish a claim for breach of the covenant of good faith and fair dealing, a plaintiff

must show that: (1) a contractual relationship existed between the plaintiff and the defendant, (2)

the defendant acted in a commercially unjustifiable manner, and (3) the defendant's action

defeated the plaintiff's legitimate expectations.  *See Oak Rubber Co. v. Bank One, N.A.*, 214 F.

Supp. 2d 820, 833 (N.D. Ohio 2002); *Agilysys, Inc. v. Gordon*, No. 1:06 CV 1665, 2008 WL

5188278, *10-11 (N.D. Ohio Dec. 10, 2008).

The Court finds that MTD has pled a plausible breach of the duty of good faith and fair

dealing claim.  As shown above, MTD has adequately alleged that the November Email was

plausibly a valid contract.  Further, MTD has also proffered that Honda knowingly induced it to

rely on Honda shipping the engines outlined in the November Email, as Honda was aware of (or

a party to) many of the conversations that MTD had with retailers in which MTD agreed to sell

Honda-powered lawnmowers throughout 2021.  (Doc. No. 31 at PageID 399; Doc. No. 30 at

PageID 362, ¶ 39.)  A Judge in this District has previously held that a party alleged a colorable

good faith and fair dealing claim by stating that the opposing party made it more difficult to

fulfill other obligations because the opposing party failed to perform a duty set forth in a binding

agreement.  *Skurka Aerospace, Inc. v. Eaton Aerospace, L.L.C.*, No. 1:08-CV-1565, 2011 WL

1135946, at *7 (N.D. Ohio Mar. 29, 2011).  Likewise, MTD has alleged a colorable claim.  *See id.*

Honda's argument that The Program – which gives Honda the ability to stop sending engines to MTD – defeats MTD's claim is unpersuasive.  In the complaint, MTD asserts that Honda breached its duty to act in good faith under the November Email, not The Program.  Also, according to MTD, The Program is a non-integrated form document executed to establish pricing and, therefore, in no way impacted the parties' rights and responsibilities found in the November Email.  (Doc. No. 30 at PageID 359, ¶¶ 22, 26; Doc. No. 31 at PageID 392-93.)  The Court cannot, as a matter of law, find that The Program dispensed Honda's duty to ship engines to MTD throughout 2021.

Accordingly, the Court DENIES Honda's motion to dismiss as it relates to MTD's breach of the duty of good faith and fair dealing claim.

### D.  Promissory Estoppel Claim

Honda moves to dismiss MTD's promissory estoppel claim.  (Doc. No. 29-1 at PageID 340.)  MTD's promissory estoppel claim is premised on Honda promising to supply it with engines throughout 2021, which it reasonably relied on by, among other things, contracting to ship lawnmowers to retailers.  (Doc. No. 30 at PageID 366.)

To survive a motion to dismiss on a promissory estoppel claim, the plaintiff must allege that (1) the defendant made a clear and unambiguous promise, (2) the plaintiff relied on the promise, (3) said reliance was reasonable and foreseeable, and (4) the reliance caused damages.  *See Krawczyszyn v. Columbian Life Ins. Co.*, No. 1:21-CV-0085, 2022 WL 1689245, at *9 (N.D. Ohio May 26, 2022).

22

Honda's bases for dismissal are essentially the same as the breach of contract and good faith covenant claims.  (Doc. No. 29-1 at PageID 340-41.)  Namely, Honda did not promise to send MTD any engines in the November Email, as those numbers were mere estimates.  (*Id.*)  Honda therefore posits that MTD has not alleged that it reasonably relied on Honda's unambiguous promise.  (*Id.*)  The motion also highlights that MTD admits in its complaint that Honda employees informed MTD in 2020 that Honda would eventually stop producing the 160 and the 190 engines, which Honda argues shows that MTD could not reasonably rely on Honda continuing to manufacture and ship these engines.  (*Id.*)

The Court finds that MTD has stated a plausible promissory estoppel claim.  If MTD's allegations are taken as true, the November Email is plausibly an unambiguous promise of Honda's overall 2021 commitment.  *See Cranpark, Inc. v. Rogers Grp., Inc.*, 498 F. App'x 563, 571 (6th Cir. 2012) (noting that whether the defendant made a clear and unambiguous promise is a question of fact).  And MTD's complaint adequately alleges that it relied on this promise because it negotiated with retailers for the shipment of completed Honda-powered MTD lawnmowers immediately before and after Honda sent the November Email.  (Doc. No. 30 at PageID 358-63, ¶¶ 16, 45.)  Finally, MTD does admit in the complaint that Honda did inform it that Honda would eventually stop producing the 160 and 190 engines, but not until "**the 2022 product year or later**."  (*Id.* at PageID 360, ¶ 29 (emphasis added).)  MTD's claim is premised on its reliance of Honda's production of the engines until the end of 2021.  (*Id.* at PageID 366, ¶ 60.)  This admission, therefore, does not favor dismissal.

Accordingly, the Court DENIES Honda's motion as to the promissory estoppel claim.[5]

---

[5] The Court notes that if a future determination is made that the November Email is, as a matter of law, a binding agreement for the sale of goods, MTD will no longer be able to recover under a theory of promissory estoppel.  *O'Neill v. Kemper Ins. Cos.,* 497 F.3d 578, 583 (6th Cir. 2007)

### E. **Tortious Interference Claim**

MTD's last claim is for Honda's tortious interference with its business relationships. (Doc. No. 30 at PageID 367.) The tortious interference section of the complaint adds the following allegations:

- "As a result of the foregoing, Honda has intentionally and unlawfully interfered with MTD's relationship with its customers." (*Id.* at PageID 367, ¶ 65.)

- "Honda has been, at all relevant times, aware of MTD's business relationships with its customers. In fact, Honda insisted that MTD provide Honda with business confidential customer information regarding volumes, pricing, and approximate delivery schedules." (*Id.* at PageID 367, ¶ 66.)

- "Upon information and belief, Honda obtained a benefit by interfering with MTD's business relationships. Upon information and belief, the actions taken by Honda have been with the goal of damaging MTD's market share and directly or indirectly diverting business to Honda's own line of lawnmowers." (*Id.* at PageID 367, ¶ 67.)

In its motion, Honda argues that this claim should be dismissed because MTD failed to allege that Honda has caused a third party to breach or refuse to contract with MTD. (Doc. No. 29-1 at PageID 342-43.) In response, MTD asserts that it did identify business relationships elsewhere in the complaint. (Doc. No. 31 at PageID 402.) MTD also cites caselaw standing for the proposition that it was not required to allege that Honda caused a third party to breach a contract to survive a motion to dismiss but only that Honda sought to make performance of a contract more difficult. (*Id.* at PageID 401.)

---

("In Ohio, [w]here the parties have an enforceable contract and merely dispute its terms, scope, or effect, one party cannot recover for promissory estoppel" (alteration in original) (internal quotations and citation omitted)). However, MTD may proceed with its breach of contract and promissory estoppel claims at this stage in litigation. *Orange Barrel Media, LLC v. KR Sunset Weho, LLC*, No. 2:21-CV-4988, 2022 WL 2482766, at *6 (S.D. Ohio July 6, 2022) ("[The plaintiff] may plead breach of contract and also promissory estoppel in the alternative if his breach of contract claim fails.").

After reviewing these arguments, the Court finds that MTD has failed to state a plausible tortious interference with a business relationship claim.

To succeed on a tortious interference with a business relationship claim, MTD must establish: (1) a business relationship, (2) the wrongdoer's knowledge thereof, (3) an intentional interference causing a breach or termination of the relationship, and (4) damages resulting therefrom.  *Hines v. Langhenry*, 462 F. App'x 500, 501-502 (6th Cir. 2011).

To withstand Honda's motion to dismiss, MTD must have alleged that Honda interfered with a business relationship.  *BCG Masonic Cleveland, LLC v. Live Nation Ent., Inc.*, 570 F. Supp. 3d 552, 559 (N.D. Ohio 2021); *see also Richardson v. CVS Caremark Corp.*, No. 1:18-CV-1308, 2018 WL 4189522, at *3 (N.D. Ohio Aug. 31, 2018) (granting motion to dismiss where the plaintiffs "allege[d] no specific instances in which patients ended or chose not to enter into a business relationship with [the plaintiffs] as a result of the statements and ma[de] only conclusory statements regarding damages"); *Barrio Bros., LLC v. Revolucion, LLC*, No. 1:18-CV-02052, 2020 WL 3547014, at *7 (N.D. Ohio June 30, 2020) (dismissing a tortious interference claim because the plaintiff only alleged the defendants' intent to interfere and knowledge of business relationships but failed to plead that the actions ended or prevented a relationship).[6]

The *BCG* case illustrates this requirement.  570 F. Supp. 3d 552, 559.  In this case, the district court dismissed a concert venue's tortious interference with a business relationship claim because the complaint did not allege that the defendant, a music promoter, ever interfered with

---

[6] In their briefs, the parties discuss whether *Adkins v. General Motors Corp.*, 556 F. Supp. 452 (S.D. Ohio 1983) requires MTD to identify the third party that it had an existing or potential business relationship that was interfered with by Honda.  But, as shown above, this district has, on numerous occasions, dismissed cases when the defendant fails to identify a third party.

any specific business relationship.  *Id.*  In the complaint, the venue provided a general allegation that the music promoter "diminished [its] business relations . . . and ability to book shows." *Id.* at 558.  The venue also referenced some of its business relationships – for example, booking agents and some performers – but never once alleged that the defendant interfered with any of these relationships.  *Id.* at 558-59.  This case then provides that a complaint must include more than just passing references to specific business relationships and a general allegation that some unidentified business relationships were interfered with to survive a motion to dismiss.  *See id.*

MTD fails to state a plausible tortious interference with a business relationship claim for the same reasons as the plaintiff in *BCG*.  Like *BCG*'s plaintiff, MTD references some specific business relationships – for example, in a footnote, MTD describes a conversation between Honda and Lowe's about MTD's sale of Honda-powered lawnmowers in Lowe's' stores.  (Doc. No. 30 at PageID 358, n.2.)  But nowhere in the complaint does MTD allege that Honda interfered with MTD's relationship with Lowe's or any other retailer.  Although the Court must construe the complaint liberally, it is not required to infer facts and allegations not found in the complaint.  *See Bassett*, 528 F.3d at 437.  MTD did not identify a specific business relationship impacted by Honda.

The authority MTD cites in its opposition brief does not save its claim.  To start, MTD relies on caselaw analyzing a tortious interference with a contract claim instead of a tortious interference with a business relationship claim.  *Miami Valley Mobile Health Servs., Inc. v. ExamOne Worldwide, Inc.*, 852 F. Supp. 2d 925, 942 (S.D. Ohio 2012) (examining the differences between a tortious interference with a contract claim and a tortious interference with a business relationship claim).  Count IV of Plaintiff's complaint is titled "Count Four: Tortious Interference with Business Relationships."  (Doc. No. 30 at PageID 367.)  Even considering this

26

caselaw, dismissal is still appropriate because both cases indicate that MTD was required to identify a contract with which Honda interfered.  *United States v. Buckingham Coal Co.*, No. 2:11-CV-383, 2013 WL 1818611, at *8 (S.D. Ohio Apr. 29, 2013) (the plaintiff identified the contract); *Kenneth J. Majcen & Assocs. v. Phoenix Assocs., Inc.*, 2001-Ohio-4121, 2001 WL 60038, at *5 (Ohio Ct. App. Jan. 18, 2011) (same); *see also Miami Valley*, 852 F. Supp. 2d at 942 (noting that the first element of a tortious interference with a contract claim is identifying "the existence of a contract" that the defendant allegedly interfered with).  This MTD has not alleged.

Accordingly, the Court GRANTS Honda's motion as to the tortious interference with a business relationship claim.

### III. <u>CONCLUSION</u>

For the reasons described above, the Court GRANTS in part and DENIES in part Honda's motion to dismiss MTD's complaint.  (Doc. No. 29.)  MTD's tortious interference with business relationships claim is hereby dismissed.

**IT IS SO ORDERED.**

_____
BRIDGET MEEHAN BRENNAN
Date: September 9, 2022                     UNITED STATES DISTRICT JUDGE