UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MTD PRODUCTS INC., | ) | Case 1:21-CV-01962 |
| | ) | |
| Plaintiff, | ) | JUDGE BRIDGET MEEHAN BRENNAN |
| | ) | |
| v. | ) | |
| | ) | |
| AMERICAN HONDA MOTOR CO., | ) | **MEMORANDUM OPINION** |
| INC., | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |

Before the Court is Defendant American Honda Motor Co., Inc.'s ("Honda") motion for summary judgment.  (Doc. 49.)  Plaintiff MTD Products Inc. ("MTD") opposed the motion (Doc. 52) and Honda replied (Doc. 53).  After review of the parties' submissions, and for the reasons explained below, Honda's motion for summary judgment is GRANTED.

I.    **Background**

A.    **Factual Background**

This is a breach of contract dispute involving the supply of lawn mower engines.  MTD is a manufacturer of lawn mowers.  Honda manufactures lawn mower engines.  (Doc. 49-1 at 1392.)[1]  MTD purchases engines for its mowers from several suppliers, including Honda.  (Doc. 52 at 1823.)  The business relationship between MTD and Honda began over 13 years ago. (Doc. 49-1 at 1395.)  It abruptly ended when Honda terminated the engine program from which MTD purchased engines for some of its mowers.  (Doc. 52 at 1822.)

The lawn mower industry is highly cyclical, yet inherently unpredictable.  (Doc. 49-1 at 1394.)  Lawn mower sales fluctuate greatly from year to year and even month to month within

---

[1] For ease and consistency, record citations are to the electronically stamped CM/ECF document and PageID# rather than any internal pagination.

model years.  (*Id.* at 1395.)  The industry works on a model year basis, beginning generally in

November of one year and ending October the next.  (Doc. 52 at 1822.)  For instance, for the

2019-2020 model year, MTD began planning in spring of 2019 and worked to sure up

manufacturing by the fall 2019, beginning production immediately thereafter for sale that next

spring.  (Doc. 49-1 at 1395–96; Doc. No. 52 at 1822–23.)  Due to the dynamic nature of the

industry, forecasting plays a crucial role.  Retailers needed to have consistent supply of lawn

mowers to sell to consumers.  Therefore, MTD needed to forecast that consumer demand to

produce enough lawn mowers without overproducing.  (Doc. 49-1 at 1395.)  In turn, MTD

needed to forecast demand to suppliers, such as Honda, so that MTD could maintain the balance

between consumer demand and its flow of lawn mowers to retailers.  (*Id.*; Doc. No. 52 at 1827.)

Honda, on the other hand, needed to also forecast consumer demand so that it knew how many

engines to manufacture in the first place.[2]

In the spring of each year, MTD discussed with retailers anticipated lawn mower volumes

for the upcoming model year.  (Doc. 52 at 1822.)  Then, in the summer, MTD would turn to

suppliers, including Honda, to forecast the supply demand MTD would need to manufacture the

mowers.  (*Id.* at 1823.)  Discussions between MTD and Honda typically concluded in the fall.

(*Id.*; Doc. 49-1 at 1395.)  Given the dynamic nature of the industry, the purpose of these

discussions was to narrow down the needed supply of engines to provide clarity to both MTD

and Honda throughout the model year.  (Doc. 52 at 1823; Doc. 49-1 at 1396.)  In general, MTD

provided an estimate to Honda regarding how many engines it thought it would need, Honda

would then provide an estimate regarding how many engines it thought it could supply MTD,

---

[2] This is further complicated because Honda is both a supplier of engines to MTD and a
competitor.  Honda sells engines to MTD for MTD's use in its lawn mowers, but Honda also
uses its own engines in its own branded lawn mowers.

and after discussions and negotiations, the parties would come to a forecast regarding MTD's need for the model year on a monthly basis.  (Doc. 49-1 at 1395; Doc. 52 at 1823.)  These numbers, even after the negotiations, were subject to constant changes based on market demands.  (Doc. 49-1 at 1396.)  In addition to the above, each year the parties executed a document called the annual "Lawn & Garden Program document," which contained Honda's terms and conditions, pricing, and engine forecast, among other things.  (*Id.*)

After the parties' discussions on the forecast and after the parties signed an annual "Lawn & Garden Program document," MTD used a release system to communicate the actual quantity of engines it wanted delivered.  The release system was an online portal operated by MTD.  (Doc. 49-10 at 1643.)  Honda could log into the portal and see the yearly forecast the parties discussed broken down by month.  (*Id.*)  About one month out, MTD—through the portal— would issue a "firm release," officially communicating to Honda that it wanted a specified quantity of engines delivered on a certain day.  (*Id.*)  In general, MTD did this on a monthly basis, providing Honda 20-30 days-notice.  (*Id.*)  MTD utilized the release system through the portal because of the markets fluctuating demands.  In this way, MTD could control the number of engines it received, thereby precisely being able to meet consumer demands, while at the same time limiting excess inventory.  (Doc. 49-12 at 1754.)

This case involves the contract discussions between MTD and Honda for the November 2020 through October 2021 model season.  That year began like many others.  (Doc. 49-1 at 1396.)  However, the COVID-19 pandemic affected negotiations.  (*Id.*; Doc. 52 at 1824.)  While the numbers exchanged by the parties throughout the negotiations were always in flux, that was particularly true for this model year because of the pandemic's effect on the global supply chain and marketplace.  (Doc. 49-1 at 1396; Doc. 52 at 1824.)  Because of this, Honda—throughout

3

the negotiations for this model year—repeatedly told MTD that it could not know with certainty the number of engines it could supply MTD. (Doc. 49-1 at 1396; Doc. 52 at 1824.)

MTD approached Honda in July 2020 to begin forecasting for the next model year. (Doc. 49-1 at 1396; Doc. 52 at 1824.) MTD provided Honda with last model year's figures to begin the initial planning discussions. (Doc. 49-1 at 1396.) However, Honda expressed doubt that it could meet those figures and communicated to MTD that it should lower the expectations with respect to engine numbers for that model year. (Doc. 52 at 1824.) MTD immediately sent a revised version with preliminary prospective numbers by month. (*Id.*) Discussions continued in mid-September. (*Id.* at 1825.) At that time Honda, continued to tell MTD that its ability to provide engines might be limited because consumer demand was extremely high and Honda was unable to keep factories open due to pandemic-related closures. (*Id.*)

In October 2020, MTD forecasted to Honda that it needed over 450,000 engines for the upcoming season. (*Id.*; Doc. 49-1 at 1396.) Honda notified MTD that number likely exceeded what Honda could provide but that it was working to provide further clarity on volumes. (Doc. 52 at 1825–26; Doc. 49-1 at 1397.) Work continued and on October 20, 2020, Honda provided MTD updated production figures. (Doc. 49-1 at 1397.) However, ten days later, on October 30, 2020, Honda followed up with MTD, expressing doubt in those figures. (*Id.*; Doc. 52 at 1826.) Honda requested more time to determine what it could supply. (Doc. 49-1 at 1397; Doc. 52 at 1826.) The parties met on November 12, 2020. (Doc. 52 at 1826.) The purpose of the meeting was twofold: one, to move towards a resolution to the forecasts for production volumes; and two, to finalize a branding agreement between Honda and MTD whereby MTD could use the phrase "Powered by Honda" on its mowers. (*Id.*) During this meeting, Honda projected to MTD that it

4

would be supplying much less engines for this model year than last.  (*Id.*)  The meeting ended

without a forecast.

The next day, on November 13, 2020,[3] MTD emailed Honda, asking: "When can we

expect your email?"  (Doc. 49-10 at 1685.)  In response, Honda sent the following:

> See attached production quantities by month.  One thing that needs to be mentioned,
> the numbers attached are for 160 and 190, both vertical and horizontal because
> they're produced on the same line.  With your current placement with GCV190 and
> GC190 on the tiller being small we will most likely be able to handle 2021 season
> placement with existing Honda inventory unless you're expecting large increases.
> If you can provide some insight on believed placement for GCV190 mower and
> tiller applications I can bounce that off our existing inventory to give you a better
> idea of our full season position.  Once you have a chance to review how you'd like
> the color split please let me know and we will do our best to accommodate MTD's
> requests within the given production volumes.

(*Id.*)  As indicated in the email, Honda attached a spreadsheet.  (Doc. 52-15 at 1967.)  That

spreadsheet shows quantities for the 2021 and 2022 selling season.  (*Id.*)  The spreadsheet

combines the quantities for October 2020 through March 2021 and then lists quantities each

month for April 2021 through March 2022.  (*Id.*)  October 2021 through March 2022 would have

been part of the next selling season (the 2022 selling season).  (*Id.*)  The figures totaled 434,553

for the end of the 2021 season and 230,256 for the beginning of the next season.  (*Id.*)  MTD

responded: "What is your inventory on the GCV & GC190?"  (Doc. 49-10 at 1684.)  Honda

responded with a further breakdown of engine models, which included the following statement:

> One thing I want to stress is that all numbers provided are as of today and I'm trying
> to be as transparent as possible with you to help you support the season to the best
> of our abilities.  Having said that, the inventory numbers I've provided are not
> secured for MTD until there's a PO in our system which is why I've asked to
> understand the placement for the 190s as quickly as possible so we can react
> accordingly.  Please keep me updated.  I'm sure a completed program will assist in
> giving me a better picture.

---

[3] This email chain will be referenced as the "November 2020 Email" hereinafter.

(*Id.*)  MTD did not respond to that email.  After receiving no response, Honda followed up with MTD on November 17, 2020, asking "Do you have a preliminary idea of MTD's plan for SKU's based [on] the production numbers we shared?"  (Doc. 53-1 at 2049.)  After another ten days of no response, Honda again followed up with MTD on November 24, 2020, asking for an update, including asking for updates on a "signed program."  (*Id.*)  MTD responded that same day, indicating that it did not know for certain yet what volume it would need in light of Honda's reduced capabilities.  (*Id.*)  Honda responded that MTD should provide some estimate on volume and that the parties could revisit the issue once MTD knew more specifics and modify any program agreement accordingly.  (*Id.* at 2048.)

On December 2, 2020, following the above email exchange, MTD signed and returned to Honda the annually signed document titled "2020-2021 Lawn & Garden Program" (the "Program Agreement").  (Doc. 49-10 at 1686.)  That Program Agreement contained Honda's terms and conditions for the program, as well as estimated quantities of engines MTD would need.  (*Id.*)  Some of those terms and conditions included: (1) MTD should give Honda 5 months lead time for orders; (2) MTD could use the marketing phrase "Powered by Honda"; (3) Honda could change or terminate the agreement before September 30, 2021 upon written notice; (4) Honda's interpretation of the agreement was final; and (5) the supply obligations would be subject to releases whereby MTD was required to report to Honda five months in advance the amount of engines to would need for the applicable months.  (*Id.* at 1686–88.)  The Program Agreement contained an addendum reflecting "estimated" engine quantities, which was filled out by MTD.  (*Id.* at 1689.)  The estimated amount in the Program Agreement was 357,000, approximately 77,000 less than the quantities stated in the November 2020 Email for that selling season.  (*Id.*)

6

After execution of the Program Agreement, the parties began performance.  However, issues quickly arose.  In January 2021, the parties discussed modifications to the release schedule because Honda was still experiencing production difficulties.  (Doc. 49-1 at 1399.)  In late January 2021, the parties discussed fluctuations to monthly volume, including February 2021 and beyond.  (*Id.*)  Honda indicated that it could supply MTD's February needs through existing inventory, but that capacity would continue to change.  (*Id.* at 1399–1400.)  During these discussions, Honda used the November 2020 Email figures as the baseline for further discussions.  (Doc. 52 at 1829.)  For instance, the parties met on February 10, 2021.  (Doc. 49-10 at 1692.)  During that meeting, Honda used a PowerPoint to convey updated engine volumes to MTD for the 2021 season and upcoming 2022 season.  (*Id.* at 1697.)  That PowerPoint compared the "11.12 Plan" with an updated "2.10 Plan."  (*Id.* at 1698.)  Honda included an asterisk for the "2.10 Plan," noting that "[t]his is out best image as of right now."  (*Id.*)  For the 2021 season, the ultimate forecast did not change, but the monthly volumes did.  (*Id.*)  After the meeting, MTD continued to issue releases which Honda fulfilled.

In April 2021, Honda notified MTD that it needed to accelerate the parties' usual timeline for next model years forecast because of continued production issues and the need to understand whether Honda could continue to supply engines.  (Doc. 49-1 at 1400.)  So, instead of finalizing forecasts in the fall, Honda wanted initial projections by May 1, 2021 with a final program in place by June 1, 2021.  (*Id.*; Doc. 52 at 1829.)  MTD provided a signed and returned program agreement, with estimated forecasts, on May 18, 2021 for the 2021-2022 model season.  (Doc. 49-1 at 1400; Doc. 52 at 1829–30.)  However, Honda did not countersign that agreement.  (Doc. 49-1 at 1400.)

At the same time, in spring 2021, Honda internally considered the cancellation of the engine program.  (Doc. 52 at 1830.)  Disruptions from the pandemic, profitability concerns, and the transition of the market to electric options weighed on Honda's decision.  (Doc. 49-1 at 1400.)  In June 2021, Honda officially decided to terminate the engine program.  (*Id.*)  Accordingly, on June 29, 2021, Honda sent a letter notifying MTD (and all other manufacturers) that Honda was discontinuing production and terminating the program.  (*Id.*; Doc. 52 at 1831.)  Honda explained that it would not accept new orders for the cancelled program after June 29, 2021.  (Doc. 49-1 at 1401.)  Pursuant to the termination letter, Honda told MTD that it would not continue to supply engines pursuant to the Program Agreement signed in December 2020, nor any engines for the following model season.  (*Id.*; Doc. 52 at 1832.)

Despite the termination, the parties met in July 2021 and came to an arrangement whereby Honda would continue to supply MTD with some engines from existing inventory, but well below the amount MTD expected previously.  (Doc. 49-1 at 1401.)  Pursuant to this agreement, MTD accepted all engines that Honda was able to provide.  (*Id.*)  Overall, this left a shortfall of some 170,000 engines which MTD believes it should have received if the termination never occurred.  (Doc. 52 at 1833.)

### B.    Procedural Background

From the above facts, MTD filed a complaint on October 15, 2021 asserting four causes of action: Breach of Contract (Count One); Breach of the Duty of Good Faith and Fair Dealing (Count Two); Promissory Estoppel (Count Three); and Tortious Interference with Business Relationships (Count Four).  After motion to dismiss briefing, the Court dismissed Count Four, but allowed all other claims to proceed.  (Doc. 40.)  After discovery, Honda moved for summary judgment.  (Doc. 49.)

8

## II.  <u>Law and Analysis</u>

### A.  **Standard of Review**

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."  Fed. R. Civ. P. 56(a). "Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and affidavits show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  The moving party bears the burden of showing that no genuine issues of material fact exist."  *Williams v. Maurer*, 9 F.4th 416, 430 (6th Cir. 2021) (citations and quotations omitted).

A "material" fact is one that "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "And a genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Abu-Joudeh v. Schneider*, 954 F.3d 842, 849–50 (6th Cir. 2020) (citations and quotations omitted).

"Once the moving party satisfies its burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact."  *Queen v. City of Bowling Green, Kentucky*, 956 F.3d 893, 898 (6th Cir. 2020) (quotation and citations omitted).  On summary judgment, the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion.  *Kalamazoo Acquisitions, L.L.C. v. Westfield Ins. Co.*, 395 F.3d 338, 342 (6th Cir. 2005).  A party asserting or disputing a fact must cite evidence in the record or show that the record establishes either the absence or the presence of a genuine dispute.  *See* Fed. R. Civ. P. 56(c) & (e).  Rule 56 further provides that "[t]he court need consider only" the materials cited in the parties' briefs.  Fed. R. Civ. P. 56(c)(2); *see also Street v. J.C.*

*Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989) ("The trial court no longer has the duty

to search the entire record to establish that it is bereft of a genuine issue of material fact.").

"Where the record taken as a whole could not lead a rational trier of fact to find for the

non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation and citation omitted). The Court's role is not

to make credibility determinations or "weigh" conflicting evidence. *Payne v. Novartis Pharms.*

*Corp.*, 767 F.3d 526, 530 (6th Cir. 2014). "The ultimate question is whether the evidence

presents a sufficient factual disagreement to require submission of the case to the jury, or

whether the evidence is so one-sided that the moving parties should prevail as a matter of law."

*Id*.

Where parties do not dispute the facts, but instead dispute whether the facts give rise to a

legal contract, "whether a contract exists is a mixed question of law and fact." *Storm v. Bureau*

*of Prisons*, 08-cv-1690, 2009 WL 1163123, at *6 (N.D. Ohio Apr. 29, 2009) (citing *Cienega*

*Gardens v. United States*, 194 F.3d 1231, 1239 (Fed. Cir.1998)). "[S]ummary judgment may be

granted where the material facts involved in the matter are undisputed and questions of law

predominate." *Am. Signature, Inc. v. Extreme Linen, LLC*, 12-cv-00601, 2015 WL 1476751, *15

(S.D. Ohio Mar. 31, 2015) (citing *Univ. of Tenn. William F. Bowld Hosp. v. Wal–Mart Stores,*

*Inc.*, 951 F.Supp. 724, 725–26 (W.D. Tenn. 1996)).

### B.     Breach of Contract

Count One asserts a claim for breach of contract.[4] Under Ohio law, breach of contract

has four elements: (1) the existence of a contract; (2) performance by the plaintiff; (3) breach by

---

[4] The parties agree that the contract in question is governed by the Uniform Commercial Code
because it is for the sale of goods. (Doc. 49-1 at 1402; Doc. 52 at 1835.) The parties also agree
that Ohio law governs the contract. (Doc. 49-1 at 1402; Doc. 52 at 1835.)

the defendants; and (4) damages or loss to the plaintiffs as a result of the breach.  *V & M Star Steel v. Centimark Corp.*, 678 F.3d 459, 465 (6th Cir. 2012) (applying Ohio law).

MTD argues the November 2020 Email constituted a binding fixed-quantity contract whereby Honda agreed to provide MTD with the number of engines in the email.  (Doc. 52 at 1835.)  Specifically, MTD argues that Honda agreed to supply it with 453,553 engines in 2021 and 230,256 engines for the first quarter of 2022.  (*Id.*)  Because Honda refused to abide by the forecast in June 2021, Honda is in breach.  (*Id.*)  Honda argues the November 2020 Email was part of preliminary negotiations which did not a form a binding contract.  (Doc. 49-1 at 1402.)  Instead, the later signed "2020-2021 Lawn & Garden Program" document is the binding contract between the parties.  (*Id.*)  But even if the November 2020 Email could be considered a contract, Honda argues that the parties' course of dealing reveals the parties had a release-by-release contract whereby the Honda's obligation to supply engines arose only after it accepted MTD's monthly release request.  (*Id.* at 1407.)  In this way, the "2020-2021 Lawn & Garden Program" is an umbrella agreement which provides forecasts, but no specific amount is obligated until the monthly release is accepted.  (*Id.*)

### 1.    The November 2020 Email

Honda argues that the November 2020 Email was not a valid and binding contract because the email was not an offer, and, even if it was an offer, MTD did not accept any purported offer.  (*Id.* at 1402.)

### a.    Offer

Under Ohio law, an offer is "the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it."  *Reedy v. Cincinnati Bengals, Inc.*, 758 N.E.2d 678, 682 (Ohio Ct. App. 2001)

(quoting *Garrison v. Daytonian Hotel*, 663 N.E.2d 1316, 1318 (Ohio Ct. App. 1995)).  An offer

may be found where "all that remained was [the offeree's] assent to form a binding agreement."

*N. Side Bank & Tr. Co. v. Trinity Aviation, LLC*, 153 N.E.3d 889, 896 (Ohio Ct. App. 2020)

(citation omitted).

Honda argues that the November 2020 Email was a preliminary estimate and not a

definite offer.  (Doc. 49-1 at 1403.)  In support, Honda cites the factual circumstances

surrounding the email in question and by relying on the parties' later formalized agreement—the

Program Agreement.  (*Id.*)  Honda relies on *Dyno Constr. Co. v. McWane, Inc.*, 198 F.3d 567

(6th Cir. 1999).  In *Dyno Constr.*, the seller of piping for sewers sent a potential buyer a

document with quantities and pricing for piping, including a handwritten note to "Please call."

*Id.* at 570.  The parties discussed the deal on the phone and the buyer thought the deal was done

when the call was over.  *Id.*  Subsequently, the seller sent the buyer a purchase order form to

finalize the deal, which included a waiver for certain liabilities.  *Id.* at 570–71.  The buyer signed

and returned the form.  *Id.* at 571.  After the piping was found to be defective, litigation

followed.  *Id.*  The buyer argued the parties' agreement stemmed from the phone call in which no

waiver of liability was signed while the seller argued no agreement was reached until the

purchase order was signed, which included the waiver.  *Id.*  The district court found that, as a

matter of law, the contract was formed via the purchase order, not the during the telephone call.

*Id.*

The Sixth Circuit affirmed.  *Id.* at 574.  The Sixth Circuit explained that "the

determination of the issue depends primarily upon the intention of the person communicating the

quotation as demonstrated by all of the surrounding facts and circumstances."  *Id.* at 572.

Accordingly, "to constitute an offer, a price quotation must 'be made under circumstances

evidencing the express or implied intent of the offeror that its acceptance shall constitute a binding contract.'" *Id.* (quoting *Maurice Elec. Supply Co. v. Anderson Safeway Guard Rail Corp.*, 632 F. Supp. 1082, 1089 (D.D.C. 1986)). The Sixth Circuit relied, in part, on the fact that the words in the alleged offer were "indicative of an invitation to engage in future negotiations rather than an offer to enter into a contract." *Id.* This included words such as "estimate" and "Please call," both of which indicates further discussions would be necessary. *Id.* Further, "nothing was stated about the place of delivery, time of performance, or terms of payment." *Id.* Lastly, the fact that the buyer signed the purchase order later demonstrates that the previous quotation was not a fully formed contract. *Id.*

Honda also argues *Am. Signature, Inc. v. Extreme Linen, LLC* supports its theory of the case. 12-cv-00601, 2015 WL 1476751 (S.D. Ohio Mar. 31, 2015). In *Am. Signature*, the court concluded no offer was extended as a matter of law with respect to the purchase of top-of-bed products. *Id.* at *16. The parties held several meetings and frequently communicated over email regarding a potential purchase. *Id.* at *4–10. The court held that a contract was not formed at these meetings because there lacked official purchase orders, the potential seller stated on numerous occasions it was waiting on sign off from superiors, and the communications lacked specific essential terms. *Id.* at *17. This conclusion was bolstered by the fact that the seller repeatedly told the buyer that the "placement of an order was contingent on the submission of purchase orders." *Id.* at *18. That fact meant that the seller "unambiguously communicated that Plaintiff did not intend to conclude a bargain until the purchase orders were submitted to Defendant." *Id.*

*Dyno Constr.* and *Am. Signature* are persuasive here. Like those cases, the November 2020 Email contains words that are "indicative of an invitation to engage in future negotiations."

13

*Dyno Constr.*, 198 F.3d at 574.  The communications show that more work was needed to finalize a deal.  For instance, similar to the "Please call" language used in *Dyno Constr.*, Honda told MTD in the emails to "Please keep me updated" and that "I'm sure a completed program will assist in giving me a better picture."  (Doc. 49-10 at 1684.)  Like in *Am. Signature* where the court found the discussions were not a contract because the seller told the buyer that nothing was secured until a purchase order was submitted, Honda specifically told MTD that "the inventory numbers I've provided are not secured for MTD until there's a PO in our system."  (*Id.*)

Moreover, the November 2020 email was not the end of the parties' discussions: Honda and MTD continued to communicate throughout November 2020 and continued to discuss production volumes.  (*Id.*)  On this point, MTD's corporate representative testified:

> A: There were many e-mail exchanges, conference calls, phone calls, we may have even had a meeting in person somewhere in there, to discuss the quantity of engines Honda would commit to supplying MTD over many months leading up to that November 13th e-mail exchange noted in the response.

> * * *

> Q: Now, the series of communications between Honda and MTD didn't cease on November 13th, did it?

> A: No, it did not.

> Q: It was an ongoing, fluid process?

> A: There were e-mails and phone calls after the 13th of November, yes.

> Q: The parties continued to work to reach an understanding of what was going to be provided and what was going to be bought, right?

> A: There were phone calls and e-mails after November 13th to talk about the quantity of engines and when they might be delivered.

(Doc 49-8 at 1543–44.)  Further, after receiving no response to the November 13 email, Honda followed up with MTD asking if MTD had "preliminary idea" of SKUs and asked for updates on

a "signed program." (Doc. 53-1 at 2049.) All of these facts indicate that Honda did not intend to be bound by the November 2020 Email forecast and that MTD could not have understood that forecast as a final binding offer for an annual commitment of engines. Here, Honda's communications to MTD indicated that something more was necessary to complete the agreement—a completed program and purchase order.

For its part, MTD argues the November 2020 Email was an offer. (Doc. No. 52 at 1835.) MTD relies on the quantity expressed in the November 2020 Email and explains that "[q]uantity is generally the only term that is required for contract formation." *Premier Constr. Co., Inc. v. Maple Glen Apartments and Townhouses Ltd.*, 159 N.E.3d 1201, 1206 (Ohio Ct. App. 2020) (citing R.C. § 1302.04). MTD also cites the context of the email, arguing that the November 2020 Email was the "culmination" and "conclusion of months of discussions." (Doc. 52 at 1836.) Further, MTD points to documents where Honda referred to the volume figures in the November 2020 Email as "commitments" and "promises." (*Id.*) MTD also contends that the parties—for years—have operated in this way where the emailed estimate from Honda guides the annual amount of engines MTD receives. (*Id.*)

As it relates to the existence of a contract, Ohio's version of the UCC does not require a writing to "contain all the material terms of the contract." R.C. § 1302.04, cmt. 1. "The only term which must appear is the quantity term . . . ." *Id.*; *Premier Constr. Co.*, 159 N.E.3d at 1206 ("Quantity is generally the only term that is required for contract formation."). "[I]f a contract lacks a quantity term, it is runs afoul of the Statute of Frauds and is not enforceable." *Orchard Grp., Inc. v. Konica Med. Corp.*, 135 F.3d 421, 428 (6th Cir. 1998) (applying Ohio law). Thus, "because a quantity term is essential to a contract for the sale of goods under the UCC," where parties reserve "that term for agreement in the future following further negotiations," no contract

15

has been formed.  *H & C Ag Servs., LLC v. Ohio Fresh Eggs, LLC*, 41 N.E.3d 915, 926–27 (Ohio Ct. App. 2015).

As an initial matter, MTD's brief contains a series of conclusions with no citations to the record.  For example, MTD asserts that the November 2020 Email "memorialized a meeting of the minds" and was the "conclusion of months of discussions."  (Doc. 52 at 1836.)  But, as explained above, MTD's own employees testified that the parties continued to discuss the matter after the November email exchange.  In fact, MTD's employees identified the Program Agreement signed on December 2, 2020, not the November 2020 Email, as "the culmination of the multiple back-and-forth e-mails and conversations."  (Doc. 49-12 at 1763.)  Without citing anything in the record, MTD says that the "annual commitments were the result of protracted bilateral negotiations, showing that there was a meeting of the minds and that the parties intended for the annual volumes to be acted upon."  (Doc. No. 52 at 1837.)  And MTD says that Honda cannot claim "MTD did not subjectively rely upon Honda's commitments in planning its own activities," but again, cites nothing to the record to show such reliance.  To successfully oppose summary judgment, a party must cite to evidence in the record that establishes a genuine dispute of material fact.  *See* Fed. R. Civ. P. 56.

Record citations aside, MTD does not address the language Honda used in the November 2020 Email which contemplates something more was necessary to formalize a deal.  And while only a quantity term is necessary for contract formation, the context of the parties' discussions indicate that the quantity term here was not definite, but instead, part of preliminary forecasts.  *See Revere Plastic Sys., LLC v. Plastic Plate, LLC*, 509 F.Supp.3d 986, 1000 (N.D. Ohio 2020) ("Forecasts are nothing more than forecasts, and do not create a legal obligation to purchase")

(quoting *Sundram Fasteners Ltd. v. Flexitech, Inc.*, No. 08-cv-13103, 2009 WL 3763772 (E.D. Mich. Nov. 9, 2009)).

In addition to the above, Honda argues that the existence of the Program Agreement defeats MTD's claim that the November 2020 Email was an offer because the parties later reduced their preliminary negotiations in a writing in the Program Agreement.  (Doc. 49-1 at 1404.)  That the Program Agreement contained different quantities terms than that November 2020 Email only further underscores this contention.  (*Id.*)  MTD argues that the Program Agreement only reflected the parties' commitment to pricing, not quantity.  (Doc. 52 at 1839.) In this way, MTD argues that the Program Agreement's estimated quantity volume only was meant to secure certain pricing for engines.  (*Id.*)  Because the Program Agreement only goes to pricing and not quantity, there is no impact on the November 2020 Email.  (*Id.*)

MTD's argument is not supported by the record evidence.  Instead, the record supports Honda's contention that the November 2020 Email was preliminary and that the controlling document between the parties—at least in part—is the Program Agreement.  Under well-established Ohio law, "[w]here an agreement contemplates further action toward formalization or if an obligation to become binding rests on a future agreement to be reached by the parties, so that either party may refuse to agree, there is no contract."  *Schlaegel v. Howell*, 42 N.E.3d 771, 780 (Ohio Ct. App. 2015) (quoting *Weston, Inc. v. Brush Wellman, Inc.*, No. 65793, 1994 WL 393685, *5 (Ohio Ct. App. July 28, 1994)); *see also Padula v. Wagner*, 37 N.E.3d 799, 806 (Ohio Ct. App. 2015) ("the law is that when a document unambiguously expresses the parties' manifest intent to not be bound by its terms until the agreement is formalized at some future date, a contract does not exist").

17

MTD's Phillip Clouse, in relation to whether the Program Agreement was the final agreement between the parties, testified:

> Q: But, again, your point would be that what was agreed to for the year -- the terms of that agreement [the Program Agreement] for the year would be what would control the parties?
>
> A: Yes.
>
> Q: . . . [F]rom your perspective and your history with the company, this [the Program Agreement] would control the parties' obligations; is that right?
>
> A: Yes.
>
> Q: . . . If we add up these numbers that Chris signed off on [in the Program Agreement], those are numbers that MTD would be expecting for the year; is that correct?
>
> A: Yes.
>
> * * *
>
> [T]his document [the Program Agreement] was probably the culmination of multiple back-and-forth emails and conversations trying to get that number tweaked . . . . And I'm sure that through these conversations that got negotiated to something that both parties could agree they could produce and consume, sell."
>
> Q: And it would evolve and be an organic process that boils down to this agreement?
>
> A: Yes.

(Doc. 49-12 at 1762–63.)  Similarly, in questioning about the Program Agreement, MTD's Chris Skripac, who signed the Program Agreement, testified:

> Q: So if you total these up, that would be the total number of engines you were . . . submitted to qualify for the program that year?
>
> A: That's how many we were expecting to get -- to receive from Honda, right.
>
> * * *
>
> Q: And so that was what you expected to receive from Honda for the year; is that correct?

A: That -- yeah, I mean, that's our -- that's basically what we were saying our commitment to our customers was, right.

(Doc. 49-10 at 1655 (objections excluded).)  And MTD's John Petz testified:

Q: Okay.  And what was your understanding about what MTD's obligations were under the Lawn and Garden Program?

A: We were to -- to purchase a defined amount of engines at a defined pricing to support the program year.

Q: And what were Honda's obligations?

A: To provide those engines at that pricing for the program year.

* * *

Q: And if we wanted to know the number of engines that Honda agreed to supply, we would look in the program documents? Is that your understanding?

A: Yeah, I mean, it would start with that.

Q: Okay.

A: What they've agreed to supply.

* * *

Q: And are you aware of what the agreement is that was breached by Honda allegedly?

A: It would be the -- get the page for the title of it. The Lawn and Garden Program.

((Doc. 49-2 at 1431, 1440, 1442 (objections omitted).)

Lastly, the spreadsheet attached to the November 2020 Email contained figures for the 2020-2021 selling season *and* the 2021-2022 selling season.  (Doc. 52-15 at 1967.)  However, MTD employees testified that it understood Honda had not yet committed to anything for the 2021-2022 selling season and that negotiations for that selling season were still ongoing (beginning in the spring of 2021).  (Doc 49-12 at 1766 (discussing communications in May

19

2021, MTD's Phillip Clouse testified "uh-huh" to whether quoting for the 2022 season was still ongoing as of May 2021); Doc. 49-10 at 1664 (discussing a May 2021 email, MTD's Chris Skripac testified that "Yeah, they [Honda] weren't ready to commit to '22 volumes yet").)  That the parties engaged in discussions for the 2021-2022 selling season in spring 2021 indicates that MTD knew Honda did not yet commit to anything.  Yet, if MTD's theory of the November 2020 Email and spreadsheet is correct, Honda *did* already commit to a large portion of the 2021-2022 selling season.  This testimony directly undermines MTD's argument that it understood the November 2020 Email as a commitment from Honda.

In conclusion, the November 2020 Email was not definite.  It contemplated that something more was necessary, specifically, the Program Agreement and a release through a purchase order.  The November 2020 Email, then, could not have been an offer.  MTD has not carried its burden to show otherwise.

      **b.**    **Acceptance**

Even if the November 2020 Email was an offer, Honda argues that MTD did not accept. (Doc. 49-1 at 1405.)  "A valid and binding contract comes into existence when an offer is accepted." *Dyno Constr.*, 198 F.3d at 572.  Under Ohio law, an offer can be accepted "in any manner and by any medium reasonable in the circumstances."  R.C. § 1302.09(A)(1).  In general, "[a]s long as both parties contemplate that something remains to be done to establish contractual relationship, no contract has been made."  *Gen. Motors Corp. v. Keener Motors, Inc.*, 194 F.2d 669, 676 (6th Cir. 1952).  Mere silence is generally insufficient to show acceptance.  *Univ. Hosps. Of Cleveland v. Lynch*, 772 N.E.2d 105, 118 (Ohio 2002) ("silence in response to an offer does not generally indicate assent").  However, a party may accept through course of performance where the offeror does not object and proceeds with performance.  R.C. §

1302.07(A) ("A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.").

MTD does not dispute that it did not communicate an acceptance to the November 2020 Email. (Doc. 52 at 1837.) Nor could it. Following Honda's email, MTD replied the same day stating, in full, "[w]hat is your inventory on the GCV & GC190?" (Doc. 49-10 at 1684.) There is nothing else in the record indicating MTD accepted the offer through another communication, and MTD points to none.

MTD argues that it accepted through performance because it issued releases throughout the relevant time period. MTD relies on *Crown Equip. Corp. v. KeHE Distribs., LLC*, 17-cv-1711, 2019 WL 4889394 (N.D. Ohio Oct. 3, 2019). In *Crown*, the parties disputed whether the parties formed a contract for a forklift the defendants received from plaintiff. *Id.* at *1. After receiving a price quotation (which the court found was not an offer), defendant submitted a purchase order for a forklift. *Id.* at *3. The court found that the purchase order was an offer. *Id.* at *4. Plaintiff did not accept that offer through a communication, but instead, manufactured the forklift to the purchase order specifications and delivered it. *Id.* The court held that this was acceptance through performance and an enforceable contract was formed. *Id.*

MTD also cites *BRC Rubber & Plastics, Inc. v. Cont'l Carbon Co.*, 900 F.3d 529, 539 (7th Cir. 2018). In *BRC Rubber*, defendant agreed to supply plaintiff with "approximately 1.8 million pounds" of material necessary to make rubber. *Id.* at 539. Among other challenges, defendants argued that because the agreement only approximated the amount of materials in the contract, it was unenforceable. *Id.* The Seventh Circuit disagreed and held that "the annual

quantity does not undermine the definiteness of the contract." *Id.* Instead, this reflected the "nimbleness" that would be required of both parties given the industry and relationship. *Id.*

Neither case persuasively supports MTD's arguments here. In *Crown*, the court found the initial price quotation sent by plaintiff could not be considered an offer as a matter of law, but a more specific purchase order signed by defendant was. Here, that works against MTD because the November 2020 Email is more akin to the price quotation in *Crown*, and the purchase order found to be an offer in *Crown* is more akin to the releases MTD issued in this case. And in *BRC Rubber*, the parties had a signed contract that expressly stated it "is the intent of this Agreement that Continental agrees to sell to BRC approximately 1.8 million pounds" of material. 900 F.3d at 539. The Seventh Circuit found that the agreement contained language that evidenced the "parties' intent to be bound," such as "obligations and terms that are to remain firm." *Id.* (citations and quotations omitted). In contrast, here, there is no such agreement evidencing an intent to be bound to the November 2020 Email. In fact, the November 2020 Email and correspondence surrounding that email indicate the lack of intent to be bound to a specified number of engines. And, as discussed more below, the only course of performance the parties had relating to any commitments was the release-by-release system which obligated engines only one month at a time.

MTD did not accept any purported offer in the November 2020 Email.

### 2. Release-By-Release Contract

Honda argues that, instead of a fixed annual quantity contract, the parties formed a release-by-release contract. (Doc. 49-1 at 1407.) Courts have recognized so-called "release-by-release" contracts where an umbrella agreement fails to specify a quantity term, and is therefore unenforceable on its own, but contemplates future releases which specify a quantity. *See, e.g.,*

22

*Advanced Plastics Corp. v. White Consol. Indust., Inc.*, No. 93-2155, 1995 WL 19379 (6th Cir.

1995); *Revere Plastic Sys.*, 509 F.Supp.3d at 999; *Harris Thomas Indus., Inc. v. ZF Lemforder

Corp.*, 06-cv-190, 2007 WL 3071676 (Oct. 19, 2007 S.D. Ohio).

Under this type of arrangement, the parties are bound by only the firm releases that

specify quantity, but those releases are subject to the terms and conditions of the umbrella

agreement. *Harris Thomas*, 2007 WL 3071676, at *5 ("where there is a blanket purchase order

in effect, but material releases are issued which govern supply and delivery, the only contracts

are the releases that have been accepted between the parties").  Here, Honda argues that the

Program Agreement is an umbrella agreement.  (Doc. 49-1 at 1408.)  That Program Agreement,

along with the parties' course of dealing, contemplates that the parties are only bound by the firm

releases issued by MTD and accepted by Honda.  (*Id.*)  Thus, Honda was not required to accept

any release MTD issued but was only obligated to provide the engines for releases Honda

accepted.  (*Id.*)  Because Honda supplied MTD with all accepted releases, Honda is not in breach

of any contract.  (*Id.* at 1410.)  And when MTD issued releases after Honda terminated the

engine program, Honda had no obligation to supply the requested engines.  (*Id.*)

MTD argues the parties did not have a release-by-release contract.  (Doc. 52 at 1838.)

Instead, MTD argues that the releases were simply logistical tools by which the parties

effectuated the annual firm commitment as stated in the November 2020 Email.  (*Id.* at 1840.)

That is, the releases specify the date and times MTD specifically wants the engines, but Honda is

still obligated to supply MTD with the total annual commitment.  (*Id.*)  In this way, the releases

draw against the firm annual commitment.  (*Id.*)  Any fluctuations to the releases were

effectively amendments to the parties' agreement.  (*Id.*)  While the Court already determined the

November 2020 Email is not an annual firm commitment, the Court nonetheless reviews the

evidence and case law regarding release-by-release arrangements because it provides further evidence that the November 2020 Email was not a firm offer.

Several courts have considered similar factual circumstances.  In *Advanced Plastics*, White Consolidated, a refrigerator manufacturer, submitted a request for a quote to purchase parts from Advanced Plastics, a manufacturer of refrigerator parts.  1995 WL 19379 at *1.  The request for a quote contained the part requested, the part number, and an estimated yearly amount White Consolidated would need.  *Id.*  Advanced Plastics responded with a price quote. *Id.*  White Consolidated then submitted a blanket purchase order, specifying the part but not the quantity.  *Id.*  The blanket purchase order referred to subsequent purchase orders to be issued by White Consolidated.  *Id.* at *1–2.  Following that, White Consolidated issued individual releases whereby it stated how much it would need at that particular time.  *Id.*  The Sixth Circuit held that the parties formed a release-by-release agreement.  *Id.* at *2–3.  Thus, when White Consolidated stopped submitting releases before the year was complete and the estimated quantity was met, the court held that no breach of contract claim could proceed.  *Id.*  Instead, White Consolidated was only required to purchase the parts per the releases, not the estimated amount in the blanket purchase order.  *Id.*

Similarly, in *Harris Thomas*, the district court found a release-by-release contract.  2007 WL 3071676, at *1.  Considering facts similar to those in *Advanced Plastics*, the court concluded that the parties had a release-by-release contract because the blanket purchase order provided there would be a "separate Scheduling Agreement Release for detailed quantities and dates."  *Id.* at *5. Harris Thomas made precision steel parts and ZF Lemforder manufactured automotive components which used those precision steel parts.  *Id.* at *3.  ZF Lemforder issued a blanket purchase order which contained an estimate purchase amount and periodically issued releases

specifying delivery dates and quantities.  *Id.*  In explaining the parties' relationship, the court

held that "where there is a blanket purchase order in effect, but material releases are issued

which govern supply and delivery, the only contracts are the releases that have been accepted

between the parties."  *Id.*  Accordingly, when Harris Thomas stopped supplying parts, it was not

in breach of contract.  *Id.* at *6.

      In *Revere Plastic*, a blanket purchase order governed the parties' relationship, but that

purchase order contained no quantity terms.  509 F.Supp.3d at 998.  Because the blanket

purchase order was not a requirements contract, the purchase order was not enforceable for lack

of a quantity term.  *Id.* at 999.  However, when a release was issued for a firm quantity, that

release, subject to the blanket purchase order, was an enforceable contract.  *Id.*  The court was

persuaded by the language in the blanket purchase order, which "contemplated that the future

releases would set the quantities."  *Id.*  Even though the parties contemplated forecasts and

projections for future orders, the court held that "[f]orecasts are nothing more than forecasts, and

do not create a legal obligation to purchase."  *Id.* at 1000 (quoting *Sundram Fasteners Ltd. v.

Flexitech, Inc.*, 08-cv-13103, 2009 WL 3763772, *8–9 (E.D. Mich. Nov. 9, 2009)).

Accordingly, while the parties agreed to the terms of the blanket purchase agreement, nothing

obligated the parties to continue shipping anything absent a release that was accepted.  *Id.*

      In contrast, in *Detroit Radiant Prods. Co. v. BSH Home Appliances Corp.*, the parties

contracted to buy and sell parts for stovetop ranges.  473 F.3d 623, 625 (6th Cir. 2007).  Initially,

the buyer requested a price quote based on the purchase of 30,000 units.  *Id.*  After a price was

agreed upon based on the 30,000 volume, defendant issued a purchase order for 15,000 units.  *Id.*

Subsequently, defendant issued another purchase ordered for 16,000 units.  *Id.*  The price for all

units coincided with the parties' price agreement based on a purchase of 30,000 units.  *Id.*

25

Defendant periodically provided a release schedule for delivery of the units, but defendant eventually dwindled this down to zero because it found a new supplier. *Id.* Overall, defendant accepted and paid for only 12,886 units. *Id.* After suing for breach of contract, defendant argued, in part, that the 30,000 unit amount was just an approximation and not a firm commitment, a commitment that only formed upon acceptance of a release. *Id.* at 626. The district court disagreed, and the Sixth Circuit affirmed. *Id.* at 631. The holding rested in part on the fact that the parties agreed to a certain price for the 30,000 units. *Id.* at 628. That indicated that the total amount—30,000—was a certain amount defendant agreed to purchase. *Id.* Otherwise, that price would not have been agreed upon. *Id.* Moreover, the actual purchase orders submitted for the 15,000 and 16,000 units contained specific amounts without any qualifiers that it was an "estimate." *Id.* at 631. The Sixth Circuit stated that the result might be different if defendant could show that the parties' course of performance showed the purchase orders were estimates, but no such evidence existed. *Id.*

In *Dean Tech. Inc. v. CE Power Solutions LLC*, plaintiff manufactured high voltage components, among other things. 96 F.Supp.3d 736, 739 (S.D. Ohio 2015). Defendant provided electrical systems to its customers. *Id.* Defendant issued three blanket purchase orders, one for each year for 2009, 2010, and 2011. *Id.* Each blanket purchase order contained quantity and price terms. *Id.* They each contemplated that defendant would issue a separate purchase order in the form of a release that would trigger the plaintiff's obligation to ship. *Id.* at 743. The crux of the dispute was whether the subsequent releases drew against the total sum in the blanket purchase orders or whether the blanket purchase orders were estimates made certain by the subsequent releases. *Id.* at 744. Plaintiff argued that defendant agreed to purchase all the units via the blanket purchase order and that the subsequent purchase orders were just to timing, but

that defendant was still obligated to buy all units listed in the blanket order.  *Id.*  The court held

that the dispute precluded summary judgment because an issue of fact existed as to whether

defendant agreed to purchase all of the units in the blanket amount, or only those in subsequent

releases.  *Id.* at 746.

In *Arrow Grp. Indus. v. MGD Mgf.*, LLC, the court found that an agreement to purchase

components for shed parts was a "fixed-quantity" agreement.  2007 U.S. Dist. LEXIS 84633

(S.D. Ohio Oct. 29, 2017).  Arrow, a manufacturer of sheds for retailers, contracted with MGD, a

manufacturer of shed components.  *Id.* at *2–3.  The parties entered into an agreement in 2005

whereby MGD would supply Arrow with a certain number of components to be released over the

year pursuant to a production schedule.  *Id.*  at *3–4.  However, when Arrow's retailers cut back

on shed orders, Arrow in turn cut back on the production schedule, eventually ending production

requests altogether.  *Id.* at *5.  In the following litigation, the court held that the 2005 agreement

was for a "fixed-quantity" because it "identifies specific quantities only and does not refer to any

forecasts or estimates."  *Id.* at *19–20.  The court specifically rejected Arrow's argument that the

2005 agreement was only an estimate, and therefore, a requirement contract was formed, holding

that the "2005 Purchase Agreement does not indicate that the quantities are 'estimates.'"  *Id.* at

*20–21.

These cases lead to this conclusion as a matter of law: if an agreement does not state a

sufficient quantity term, the agreement is unenforceable.  However, if the parties subsequently

specify quantity through releases, those releases are enforceable and are subject to the umbrella

agreement.  After a review of these cases, and the facts applicable here, the Court finds that the

parties' agreement in this case is a release-by-release arrangement as a matter of law.  As

explained below, the evidence shows that the parties came to an understanding regarding a

27

forecast for the next model year in the fall.  That forecast was just that—a forecast, not a legal obligation.  That is not to say the forecast was not important to both parties.  It was.  It allowed MTD to generally understand what Honda could supply, and it allowed Honda to generally understand what MTD needed.  But neither party committed to purchase anything through the forecast.  The Program Agreement further confirms this understanding, explaining that the forecast could be "locked" through a release.  The parties then utilized the forecast to guide the relationship, but no firm commitment was made until MTD issued a release that Honda accepted.

First, the parties' agreements confirm the parties had a release-by-release agreement.  The Program Agreement governs the parties' relationship—at least in part—for the 2021 model season.  The Program Agreement provides: "This program will be applied to qualifying units invoiced to the OEM from October 1, 2020 through September 30, 2021."  (Doc. 49-10 at 1686.)  The Program Agreement requires MTD to "generate a 12 month Honda Engine delivery forecast."  (*Id.*)  The Program Agreement further provides that "[t]o secure capacity and plan for your needs, a five-month locking period should be considered for all forecast and related deliveries."  (*Id.*)  In the general terms and conditions, MTD was required to "forecast and order engines with Honda's standard lead time."  (*Id.* at 1688.)  Accordingly, from the Program Agreement, the parties structured the relationship such that they would engage in forecasting for engines, but that forecast would not be "locked" nor "firm" until a release was issued.

Moreover, the Program Agreement contains an addendum that MTD filled out which specifies the forecast for the upcoming model year contemplated by the agreement.  With respect to the Program Agreement, MTD employees testified that the quantity numbers were mere forecasts:

Q: And those pricing documents, what do you see the figures in those being?

> A: What did I see those figures in those being? For the most part those were our commitments, what we thought our commitments to our customers were.
>
> Q: Did you see it as a requirement for MTD to purchase those quantities?
>
> A: I mean, really it was we were just giving them volumes so that they could prepare and deliver to us.
>
> Q: So they were forecasting so you could partner with them?
>
> A: By giving them a -- giving them a sneak peak into the volumes for our customers so that they could prepare to meet our deliveries, yeah.

(Doc. 49-10 at 1650–51.) Accordingly, any discussion of quantity, whether in the Program Agreement or otherwise, was a forecast, not a "locked" or "firm" obligation. And while MTD argues that November 2020 Email forecast controls over the Program Agreement's forecast, even if true, the numbers there were still a forecast, nothing more. In any event, the November 2020 Email forecast is still subject to the later signed Program Agreement, which contemplates, exactly as the parties have structured, a twelve-month forecast followed by a firm locking release.

MTD disputes the Program Agreement's applicability to matters outside of setting pricing. But MTD cannot pick and choose which parts of a signed agreement are applicable and which are not. It is undisputed that MTD signed the Program Agreement and that it is a valid and binding contract that controls, at least in part, the parties' relationship for the applicable model year. While MTD argues that the Program Agreement is not a fully integrated document, Honda does not argue otherwise. Instead, the Program Agreement is a partially integrated document that, as explained above, contemplates further agreements between the parties, specifically, releases. MTD's characterizations of the Program Agreement as "boilerplate" and containing "fine print" are equally unpersuasive. Boilerplate language does not negate the applicability of contractual terms. *See Bohl v. Hauke*, 906 N.E.2d 450, 455 (Ohio Ct. App.

29

2009).  And the Program Agreement contains no fine print—the entire agreement spans three

pages, with an additional three-page addendum for forecasted quantities.  (Doc. 49-10 at 1686.)

The entire agreement is in the exact same font.  (*Id.*)

Second, testimony from MTD's employees confirms the release-by-release arrangement.

MTD's Mary Rooks, who operated the release system at MTD, testified:

> Q: So once Honda has received your release and accepted it and issued a sales order,
> it's at that point that Honda would be obliged to provide that engine?
>
> A: Yes.
>
> Q: And prior to that point, Honda wasn't obliged to provide that engine, correct?
>
> A: Yes.

(Doc 49-11 at 1732 (objections excluded).)  MTD's Chris Skripac testified that MTD specifically

chose a release-by-release system rather than a traditional purchase order:

> Q: So, in general, let's talk about why the releases were used versus a more
> traditional purchase order.
>
> A: MTD always used blanket orders and then put firm release -- that's just the way
> we operated with our suppliers.

(Doc. 49-10 at 1645.)  And MTD's Edward Griffin testified that:

> Q: Before a shipping release was entered into the portal, had you ordered any
> engines from Honda, to your understanding?
>
> A: No.
>
> * * *
>
> Q. Okay. Did you understand that MTD was supposed to provide a PO or some
> other document to Honda before that would be noted in Honda's system as being
> attributed to MTD?
>
> A. They would certainly need a PO from us before they could deliver engines. I
> would agree with that.
>
> Q. Okay. Would they also need a shipping release before they could deliver engines
> to MTD?
>
> A. That was our standard practice.

(Doc. 55-4 at 2247.)  MTD's corporate representative described the system as well:

> Q. Okay. And you do understand the general way the parties dealt with each other was MTD would issue a release, Honda, once they accepted the release, would provide the engine. Is that how it worked?
>
> A. Yes. Generally, that's how it worked.
>
> * * *
>
> Q. And the actual quantity of engines in the given season that you would end up actually issuing releases on would evolve based on what you would hear from your customer during the season?
>
> A. It would depend on what we were hearing from our customer and also might depend on what we hear from Honda and their ability to deliver.

(Doc. 55-5 at 2276, 2280 (objection omitted).)  Moreover, the parties routinely used the word "forecast" for the estimate of engines MTD believed it needed for the model year, and routinely used the words "firm release" to describe the submission of a particular release.  While both parties may have desired that the forecasts be as accurate as possible for business purposes, that forecast did not become "firm" until a release was issued.  For instance, in a 2019 email chain, Honda asked MTD to provide a "12 month delivery forecast" with a rolling "5 fixed months." (Doc. 49-10 at 1679.)  MTD pushed back on this demand, explaining that "our quantities will fluctuate based on customer demand" and that "MTD will make sure to give Honda at least 20 days of firm releases."  (*Id.* at 1680.)  That is, MTD did not want to commit to a "fixed" amount five months in advance, but rather, chose to commit only one month at a time.  In fact, the quantities in the firm releases could vary or be cancelled altogether by MTD.  (Doc. 49-12 at 1751, 1757; Doc. 49-11 at 1729; Doc. 49-10 at 1645.)

As in *Advanced Plastics*, *Harris Thomas*, and *Revere Plastic*, the parties' communications and agreements contemplated that something more was needed to specify

31

quantity.  Just like in *Advance Plastics* and *Harris Thomas*, where blanket purchase orders contained estimates but required the buyer to submit releases for specific quantities, the Program Agreement here operates in the same release-by-release manner.  And as in *Revere Plastic* where the communications and agreements between the parties "contemplated that the future releases would set the quantities," here, the November 2020 Email, along with the parties' agreements and course of dealing, reveal that quantities were set by the releases to be governed by the Program Agreement.

*Detroit Radiant*, *Arrow Grp.*, and *Dean Tech.* are all distinguishable and serve to further prove the nature of the parties' relationship in this case.  In *Detroit Radiant*, the court found the parties agreement was for a fixed quantity because the agreement contemplated the quantity was tied to a specific price and the purchase orders submitted contained no language that they were estimates.  In *Arrow Grp.*, the court held the agreement was for a fixed quantity because the agreement "identifies specific quantities only and does not refer to any forecasts or estimates." But here, the Program Agreement specifically states that the quantities are forecasts and the language used on the November 2020 Email indicate that the quantities are estimates subject to change.  And in *Dean Tech.*, the blanket purchase order in that case specifically contemplated that subsequent orders would be drawn against the blanket.  (Doc. 53-3.)  The blanket purchase order stated:

> These items are for a blanket order that will have ***multiple release requests against it*** and multiple ship dates. Since that is the case no due dates have been entered on the P.O. ***A new purchase order number will be issued for each release against this blanket order*** when the requirement for said components is needed to CE Power Solutions LLC.

(*Id.* (emphasis added).)  No such provision exists here either in the parties' email correspondence or the Program Agreement such that the Court can find the releases draw against the forecast.

32

In conclusion, the Court finds that the November 2020 Email was not an offer accepted by MTD.  Instead, it was an estimate.  The parties' later agreement, the Program Agreement, contemplates that MTD would issue releases to specify the amount of engines it wanted.  Prior to the issuance of the release, and subsequent acceptance by Honda, Honda was not obligated to provide MTD any engines.

### 3.  Honda's Right to Terminate the Program Agreement

Honda argues that it did not breach any agreement with MTD because the release-by-release system allowed Honda to stop at any time.  However, even if the November 2020 Email was a firm commitment, Honda argues it could terminate that commitment because the Program Agreement gave Honda the right to end the relationship.  (Doc. 49-1 at 1410.)  The Program Agreement provides: "This program is subject to . . . termination before September 30, 2021 with written notice from Honda."  (Doc. 49-10 at 1688.)  In opposition, MTD repeats similar arguments described above, namely that the Program Agreement only goes to pricing.  (Doc. 52 at 1841.)  But for the same reasons described above, those arguments are unpersuasive.  MTD further argues that the termination provision is a "throw-away sentence."  (*Id.*)  As above, these characterizations are wrong.  The termination provision is plainly stated in the Program Agreement along with the other terms and conditions.  MTD cannot avoid the plainly worded terms of the agreement it signed by characterizing its terms as it chooses.

The only substantive argument MTD raises is that the termination must still be reasonable, including reasonable notice of termination and a reasonable period of time between notice and actual termination.  (*Id.*)  Because Honda provided same day notice, MTD argues it should still reach a jury on whether notice was reasonable.  (*Id.* at 1841–42.)  In support of this argument, MTD cites *Consun Food Indus., Inc. v. Fowkes*, 610 N.E.2d 463 (Ohio Ct. App. 1991)

33

and *Grandview Hts. v. Columbus*, 190 N.E.2d 453 (Ohio 1963). However, both of these cases involved contracts of indefinite duration and neither contract had a termination provision at all. MTD also cites *Sundram Fasteners Ltd. v. Flexitech, Inc.*, 08-cv-13103, 2009 WL 2351763 (E.D. Mich. July 29, 2009). That case did involve a termination provision, but that provision did not contain a notice requirement, and so the court applied the default rule that "reasonable time" needed to be provided. *Id.* at *19. But here, there is an express termination provision that also contains a notice provision.

MTD also argues that the notice provision does not dispense with the reasonable time requirement. Under Ohio's version of the UCC, "[t]he time for . . . any . . . action under a contract [unless] agreed upon shall be a reasonable time." R.C. § 1302.22(A). Here, however, the parties did dispense with the reasonable time requirement. The Program Agreement allows Honda to terminate the agreement "with written notice." Effectively, this means that Honda could terminate the agreement immediately upon that written notice.[5] This interpretation makes sense in light of the parties' course of dealing, as discussed above.

In conclusion, even if the parties' agreed to a fixed-quantity contract through the November 2020 Email, Honda could terminate that agreement with written notice. Honda provided written notice on June 29, 2021.[6]

---

[5] Honda also argues that it interprets the termination as terminable immediately, and because the Program Agreement contains a clause that states Honda's "interpretation of this program is final," its interpretation prevails. *See Wilson v. Career Educ. Corp.*, 729 F.3d 665, 672 (7th Cir. 2013) (concurring opinion) (explaining that courts should uphold contract provisions allowing one parties' interpretation to control, so long as that interpretation is not unreasonable). It does not appear that any court interpreting Ohio law has found these provisions enforceable (or not enforceable). Because the Court finds that the Program Agreement allows the termination immediately, the Court does not reach this issue.

[6] The Court does not reach Honda's argument that even if a reasonable time requirement was necessary, it provided reasonable notice because it continued to work with MTD to ensure some supply of engines to MTD continued in light of the termination.

C.    **Breach of the Covenant of Good Faith and Fair Dealing**

In Ohio, "every contract imposes an implied duty of good faith and fair dealing in its performance and enforcement." *Lucarell v. Nationwide Mut. Ins. Co.*, 97 N.E.3d 458, 464 (Ohio 2018). "[G]ood faith is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could have not been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties." *Id.* (quoting *Ed Schory & Sons, Inc. v. Soc. Natl. Bank*, 662 N.E.2d 1074 (Ohio 1996)). But the Ohio Supreme Court has rejected "the contention that a party breaches the implied duty of good faith and fair dealing merely by seeking to enforce the contract or by acting as permitted by its express terms." *Id.* at 469. Accordingly, in Ohio, "there is no violation of the implied duty unless there is a breach of a specific obligation imposed by the contract." *Id.* In this way, "there is no independent cause of action for breach of the implied duty of good faith and fair dealing apart from a breach of the underlying contract." *Id.*; *see also Urbassik v. Am. Fam. Mut. Ins. Co.*, 657 F.Supp.3d 1015, 1025 (N.D. Ohio 2023) ("there is no cause of action for breach of the implied duty of good faith and fair dealing where there is no breach of the underlying contract").

Here, for the reasons explained above, Honda acted in accordance with the terms of the contract between the parties. Thus, as a matter of law, Honda could not have breached the covenant of good faith and fair dealing.

MTD asserts a number of reasons why Honda acted in bad faith. However, "good faith is not an invitation for a court to decide whether one party ought to have exercised privileges expressly reserved in the document." *Summitcrest, Inc. v. Eric Petroleum Corp.*, 60 N.E.3d 807, 820 (Ohio Ct. App. 2016) (citation omitted). Instead, companies "that have negotiated contracts are entitled to enforce them to the letter, even to the great discomfort of their trading partners,

without being mulcted for lack of 'good faith.'" *Ed Schory & Sons*, 662 N.E.2d at 1082.  Here,

that is what Honda has done.  Though MTD argues a good-faith partner would not have acted as

Honda did, Honda was simply exercising the rights it had under the contract MTD signed.  Thus,

there is no claim for breach of the implied covenant.

### D. Promissory Estoppel

Under Ohio law, promissory estoppel has four elements: (1) the defendant made a clear

and unambiguous promise; (2) the plaintiff relied on the promise; (3) said reliance was

reasonable and foreseeable; and (4) the reliance caused damages. *Current Source, Inc. v. Elyria

City Sch. Dist.*, 813 N.E.2d 730, 737 (Ohio Ct. App. 2004) (citing *Rigby v. Fallsway Equip. Co.,

Inc.*, 779 N.E.2d 1056, 1061 (Ohio Ct. App. 2002)).

MTD argues that Honda made a clear and definite promise to supply the engines as stated

in the November 2020 Email for the 2021 and 2022 model years.  (Doc. 52 at 1845.)  MTD

further argues that it reasonably relied on that promise when making its own volume

commitments to customer, and that Honda knew MTD relied on those numbers in the November

2020 Email.  (*Id.*)

The promissory estoppel claim must be dismissed because MTD has not presented nor

cited to evidence in support of all elements of promissory estoppel.  MTD states that Honda

"made a clear and definite promise" in the November 2020 Email, but MTD provides no record

citation for that proposition.  As described above, the November 2020 Email was not a "clear and

definite promise" because it contained conditional language and indications that the email was

merely a forecast.  Moreover, while MTD says that it reasonably relied on the November 2020

Email in making its own volume commitments, it has presented the Court with no evidence in

support of that proposition.  Similarly, MTD claims that once Honda's forecast is in place, it

relies on those forecasts to meet its commitments to customers and begins a series of production-related activities.  But again, MTD fails to cite record evidence to support that it relied on the November 2020 Email.

The only citation to record evidence in MTD's promissory estoppel section is to a deposition of a Honda employee which MTD cites to show Honda knew MTD relied on the November 2020 Email.  (*Id.* at 1845.)  Yet a review of that deposition does not support the proposition MTD cites it for.  Instead, the deposition testimony involved the Program Agreement and MTD's compliance (or non-compliance) with the general terms and conditions.  (Doc. 55-11 at 2596.)  Nothing in the testimony cited involves Honda's knowledge of MTD's reliance.  Conclusory allegations at the summary judgment stage are insufficient.  *See Viet v. Le*, 951 F.3d 818, 823 (6th Cir. 2020) ("The party must identify specific facts, as opposed to general allegations, establishing the element."); *Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009) ("Conclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment.").  Because fails to provide MTD evidence, its claim cannot survive summary judgment.

**III.**     <u>**Conclusion**</u>

For the reasons stated above, Honda's motion for summary judgment (Doc. 49) is GRANTED.  This case is dismissed.


**IT IS SO ORDERED.**


**Date**:  August 12, 2024

_____
BRIDGET MEEHAN BRENNAN
UNITED STATES DISTRICT JUDGE